BAKER et al. v. KANSAS CITY, FORT SCOTT AND MEMPHIS RAILROAD COMPANY, Appellant.

In Banc, December 13, 1898.

1. **Appeals:** FORMER DECISION: HOW FAR RES ADJUDICATA. The rule as to how far the decision of the Supreme Court on a former appeal in the same case, is *res adjudicata* of the case, is this: If neither the evidence nor the instructions have been materially changed upon a retrial, then the opinion of the Supreme Court is the law of the case upon another appeal as to all points considered and actually decided, where they have been fairly presented, and where no decision of this court has been overruled inadvertently.

2. ——: ——: ——: NEGLIGENCE: SAME INSTRUCTION. Where the same instruction as to negligence has been given at both trials, and there has been no material change in the evidence on the question of negligence, the former opinion of the Supreme Court on that subject is the rule of the case on the next appeal.

3. Negligence: RAILROAD CROSSINGS: RIGHT TO USE. The right of a railroad company to the use of its tracks for the movement of its engines and cars, is no greater in the eye of the law, than the right of an individual to travel over a highway extending across such tracks. The right to recover can not be denied the traveler for injury by the cars, simply because he was on the track at the time the injury was received.

4. ——: ——: DUTY OF COMPANY AND TRAVELER: PRECAUTIONS. The precautions to be used by both the railroad company and the traveler, at railroad crossings, necessarily vary with varying circumstances, and no positive rule can be laid down which can be made a test in every case, except the imperative rule that it is the duty and obligation of each to watch for the presence of the other, the one to avoid being injured, the other to avoid causing injury.

5. ——: ——: ——: WARNING: TRAVELERS IN CITY AND COUNTRY. The law of negligence relating to country railroad crossings is the same as that relating to city crossings. It has no greater regard for the traveler in the city than for the one in the country. The law in each case compels the railroad to give the traveler an effective warning of the approach of trains or cars.

6. ——: ——: EXTRA DANGER. When a railroad company has created extra dangers to travelers upon a public highway, it is bound to use extra precautions to avert such dangers.

7. Warnings at Crossing. The yelling and whistling of a man on the front of a car as it crosses a public road, are not as an effective warning as the whistle of a locomotive, or the ringing of its bell, and if cars are run across without an engine, some warning must be given which is as effective as that required by the statute.

8. **Statutory Warning**: SUBSTITUTES. Where a railroad company can not give the statutory warning of ringing the bell and sounding the whistle as its cars approach a highway crossing, it must do some-thing equally as effective to protect the traveler. Not to do so is negligence.

9. **Harmless Instruction**: EFFECT OF DANGEROUS SITUATION ON PLAINTIFF. An instruction told the jury that they might "consider what influence or effect, if any, the passing of the engine would have upon the mind and conduct of a prudent person placed as plaintiff then was." *Held*, that the instruction was concerning a matter which it was proper for the jury to consider, and being no comment thereon, it did defendant no harm.

10. **Contributory Negligence**: "STOP, LOOK AND LISTEN": EXCEP-TIONS. Some box cars were cut loose from a train west of a road crossing, and the engine, caboose and three coal cars ran rapidly to a point about a quarter of a mile east of the crossing, and the loose box cars were permitted to run on down the incline at the rate of five, six or seven miles an hour, the purpose being to have them attached to the engine on the main track again, after it had side-tracked the coal cars, "to avoid making two extra stops." The plaintiff attempted to cross the track after the engine and four cars had crossed the public road, and while the other cars were to the west of the crossing; by reason of obstructions, these cars were not where she could see them all the time. The conductor who was at the front end of the forward car yelled and whistled, but she did not hear him. When she got upon the crossing she saw the cars coming towards her, became confused, and drove in front of them and was hurt. *Held* that, under these circumstances, the well-known rule of "stop, look and listen," does not apply and the rule is not impaired by holding this case to be an exception.

11. ———: ———: ———: ON THE TRACK: CONFUSION. After plaintiff got on the track and saw the cars for the first time, she was required to do no more than a reasonably prudent person would have done under the circumstances.

12. **Railroads**: FLYING SWITCH: DEFINITION. The definition given to a "flying switch" in the majority opinion on the former appeal in this case (122 Mo. 533), was a mistaken one. Under the facts in this

case it is held that, if, after the engine had crossed the public road, the coal cars had been cut off while in motion and their speed slackened, or that of the engine increased, so that the engine could pass a switch on the main track in time for it to be thrown to receive upon the switch track the on-coming coal cars, approaching by their own momentum, a running or flying switch would have been made.

*Appeal from Henry Circuit Court.*—HON. JAMES H. LAY, Judge.

AFFIRMED.

Plaintiff's instructions in this case were as follows:

"1. The court instructs the jury that if from the evidence you believe that the defendant, by its servants or employees, on or about the 9th day of October, 1898, cut a number of its cars loose from the rest of its train and permitted them to run at a dangerous rate of speed across the public highway, just after the rest of the train had passed where defendant's railroad crosses said public highway, near the city of Rich Hill, in Bates county, Missouri, without a locomotive attached to said cars, and without giving any warning sufficient to notify persons approaching and about to pass over said crossing that said cars were coming, and in such manner as to endanger travelers along said highway, then such conduct constituted negligence on the part of said defendant railroad company. And if you further believe from the evidence that the plaintiff, Martha Baker, while passing along said highway, attempted to cross defendant's railroad, and while exercising the care and caution that a prudent person under like circumstances would have done, was struck and injured by the said cars of the defendant,

run and managed in the manner aforesaid, then your verdict must be for the plaintiff."

Number 2 was as to the damages.

"3.    The court instructs the jury that before you can find that the plaintiff, Martha Baker, was guilty of contributory negligence, it must be shown by the preponderance of all the evidence in the case."

The following instructions were given at the instance of the court:

"1.    You are further instructed, that the law cast upon Martha Baker the duty, when approaching the railroad crossing, of looking and listening to discover approaching cars or trains, if any, and she was bound to so look and listen to the extent that a prudent person, situated as she then was, would under the like circumstances have done; and if she failed so to do, the plaintiffs can not recover unless it appears to the satisfaction of the jury from the evidence that her failure, if any, to so look and listen, did not cause or contribute to the injury complained of, but that the accident and injury were caused wholly by negligence upon the part of defendant, as charged in the petition.

"In determining whether Martha Baker was prudent or careless, cautious or reckless, that is, whether or not she acted as a prudent person in her situation would have done, you may consider (if you find there was negligence in cutting the train and passing it in sections over the crossing, and that such negligence caused the injury complained of), what influence or effect, if any, the passing of the engine and attached part of the train in question as the same passed would have upon the mind and conduct of a prudent person placed as she then was."

Number 2 was as to credibility of witnesses.

"3.    If the jury believe from the evidence that Mrs. Baker looked up the track west, at a point sufficiently near

the main track to see the approaching cars in time to avoid being struck by them and, having seen the approaching cars, still hurried on in front of the same in an attempt to beat them over the crossing, and that a person of ordinary prudence would not have done so under similar circumstances, then the defendant is not liable to her for any injuries that may have resulted from the collision and you will find for the defendant."

The last instruction was number 17 asked by defendant, with the words, "and that a person of ordinary prudence would not have done so under similar circumstances" inserted by the court.

The court refused defendant's instruction numbered 13, which was as follows:

"13.   If the jury believe from the evidence that Mrs. Baker, as she drew near the track on which the box cars were moving, saw them approaching in time to have stopped her team before she drove upon that track and to avoid being struck, then your verdict must be for defendant."

WALLACE PRATT and I. P. DANA for appellant.

(1)   The issues in the case are limited to the express allegations of negligence made in the petition.   Not only must defendant's acts be proved as charged in the petition, but there must also be proof that the acts were negligent and that they caused plaintiff's injury.   Reed v. Railroad, 50 Mo. App. 506; Harlan v. Id., 65 Mo.22; Stepp v. Id., 85 Mo. 233; Stanley v. Depot Co., 114 Id. 606; Current v. Railroad, 86 Id. 62, 67; Harty v. Railroad, 95 Id. 368. (2)   The coincidence of defendant's act and of plaintiff's injury did not prove or tend to prove that the act was negligent.   Mathiason v. Mayer, 90 Mo. 585; Stepp v. Railroad, *supra;* Murray v. Railroad, 101 Mo. 236; Gurley v. Railroad, 104 Id. 233.   (3)   Even though negligence of

defendant as charged in the petition caused the injury complained of, yet, if negligence on the part of plaintiff concurred therewith, no recovery can be had for such injury. Where the negligence of both parties concurs, the law allows neither a recovery. Craig v. Sedalia, 63 Mo. 420; Nolan v. Shickle, 69 Id. 340; Milburn v. Railroad, 86 Id. 109. (4) In the case at bar the question of whether or not defendant was negligent, and whether or not, if it was, such negligence caused plaintiff's injuries, were not submitted to the jury, but the court found both facts against defendant and so instructed the jury, although no act of defendant complained of was a violation of any statutory or municipal regulation, nor had any or all of such acts ever before been pronounced negligence *per se*. (5) But, in spite of the fact that the evidence showed or tended to show that plaintiff did two things, each of which this and other courts have repeatedly pronounced negligent *per se,* the trial court left it to the jury to say whether such acts were or were not negligent. (6) None of the questions raised by appellant on this, the second appeal in the case at bar, were adjudicated on the first appeal so that they can not be inquired into now. Boone v. Shackleford, 66 Mo. 493; Bird v. Sellars, 122 Id. 231; Wernse v. McPike, Adm'r, 100 Mo. 476; Herman on Estoppel, p. 118; Wells' Res Adjudicata, sec. 619; Rutledge v. Railroad, 123 Mo. 121; Kelly v. Thuey, 143 Mo. 422 . (7) Plaintiff's instruction number 1 was erroneous because it told the jury that if defendant did certain things, none of which were forbidden by law or have ever been branded by the courts as negligence *per se,* the defendant was negligent. Hornblower v. Crandall, 78 Mo. 581; Jacquin v. Cable Co., 57 Mo. App. 339; Vanhouser v. Berghoff, 90 Mo. 487; Reed v. Botts, 100 Id. 62; Schlereth v. Railroad, 96 Id. 509; Mateer v. Railroad, 105 Id. 320. (8) The result reached in the opinion on the first appeal

Baker v. K. C., Ft. S. & M. R. R. Co.

on this phase of the case ought not to stand, even on the facts as stated by Judge BLACK in the opinion then written, because the conclusion is contrary to repeated decisions of this court. Butts v. Railroad, 98 Mo. 272; Kelly v. Railroad, 88 Id. 534; Yancy v. Railroad, 93 Id. 433; Kelsay v. Railroad, 129 Id. 362; Hayden v. Railroad, 124 Id. 566; Huggart v. Railroad, 34 Id. 673. (9) The unavoidable conclusion from the testimony is that the injured plaintiff was negligent and that such negligence directly contributed to, if it was not the sole cause of, her injuries. Harlan v. Railroad, 64 Mo. 480 and 65 Mo. 22; Fletcher v. Railroad, 64 Id. 484; Henze v. Railroad, 71 Id. 636; Purl v. Railroad, 72 Id. 168; Turner v. Railroad, 74 Id. 602; Hixson v. Railroad, 80 Id. 335; Fox v. Railroad, 85 Id. 679; Kelly v. Railroad, 88 Id. 534; Yancy v. Railroad, 93 Id. 433; Butts v. Railroad, 98 Id. 272; Hayden v. Railroad, 124 Id. 566; Kelsay v. Railroad, 129 Id. 362; Huggart v. Railroad, 134 Id. 673; Lane v. Railroad, 132 Id. 4; Boyd v. Railroad, 105 Id. 371.

WALLACE & WALLACE and C. C. DICKINSON for respondents.

(1) The act of the defendant in running its train in sections at a rapid rate of speed across this highway, for the mere purpose of saving time in making a switch, was gross if not criminal negligence. It was an act of negligence *per se.* Baker v. Railroad, 122 Mo. 533; French v. Railroad, 116 Mass. 537; Brown v. Railroad, 32 N. Y. 597; Buhter v. Railroad, 28 Wis. 487; Ward v. Railroad, 85 Wis. 601; Ferguson v. Railroad, 63 Wis. 145; Railroad v. Batches, 55 Ill. 379; York v. Railroad, 84 Me. 117; Conly v. Railroad, 89 Ky. 405; Railroad v. Schmidt, 126 Ind. 290; Railroad v. Shields, 90 Ala. 29; Railroad v. Converse, 139 U. S. 469; O'Connor v. Railroad, 94 Mo. 150. (2) Nor

does the fact that the conductor remained on the cars which struck Mrs. Baker relieve the act of its unlawful character. Railroad v. Batches, 55 Ill. 379; French v. Railroad, 116 Mass. 537; Railroad v. Oshields, 90 Ala. 29; Ward v. Railroad, 85 Wis. 601. (3) The plaintiff was not guilty of contributory negligence. This was a question for the jury, and upon which the defendant had the burden of proof. Brown v. Railroad, 32 N. Y. 597; French v. Railroad, 116 Mass. 537; Ferguson v. Railroad, 63 Wis. 145; Butler v. Railroad, 28 Wis. 487; York v. Railroad, 84 Me. 117; Ward v. Railroad, 85 Wis. 601; Railroad v. Summers, 68 Miss. 566; Baker v. Railroad, 122 Mo. 533; O'Connor v. Railroad, 94 Mo. 150; Jennings v. Railroad, 112 Mo. 268; Easly v. Railroad, 113 Mo. 236. (4) The question of the defendant's negligence and as to negligence on the part of the plaintiff and the rules of law applicable thereto were passed on by the court on the former appeal, 122 Mo. 533. The case was tried the second time on instructions approved by this court when the case was here before. As the case was retried in accordance with the rules then laid down, these questions are *res judicata* and are not subjects to be reviewed a second time. Overall v. Ellis, 38 Mo. 209; Bank v. Taylor, 62 Mo. 338; Conroy v. Iron Works, 75 Mo. 652; Gaines v. Fender, 82 Mo. 497. (5) The specific rule of law applicable to the case of a traveler about to cross a railroad track in ordinary cases, and which is that he shall not voluntarily place himself upon the track after he discovers a train approaching, does not apply under the complicated circumstances of a case like this. It can not be said that a person in that situation, placed there by the negligence of the railroad company, taken by surprise and without time to determine whether it is safe to stop or go forward, should have adopted the course, which in the light of subsequent events, is seen to have been the best one. Kleiber v. Rail-

road, 107 Mo. 240; Adams v. Railroad, 74 Mo. 553; Dona-
hoe v. Railroad, 91 Mo. 357; Brown v. Railroad, 32 N. Y.
597.

TICHENOR, *Special Judge.*—I. It is certain that
these parties have had a day in court. There have been two
verdicts before different judges, and two appeals have been
taken, upon which five arguments have been heard. The
opinion on the first appeal is found in 122 Mo. 533, and ar-
gument has been made as to the effect which is now to be
given to it. Counsel for appellant say in their last brief,
"The rule to be gathered from the decisions of this court on
this question seems to us to be substantially this: That where
the rulings on the first appeal are followed at the second
trial, this court will not consider itself bound by such rul-
ings, unless a contrary ruling on the second appeal would
prejudice the rights of the party following the first deci-
sion." They also urge, as another reason for their position,
that "no directions were given in remanding the cause,"
such as are given in equity cases, where the court passes upon
the evidence, and in other cases where the facts, or at least
a part of them are admitted.

It is true that no statute regulates this subject; that
this court is not bound to respect its opinion given upon a
first appeal when others are taken, yet I do not think that
its decisions sustain the position of counsel.

Judge BLACK, speaking for the court, says, in Keith v.
Keith, 97 Mo. 231: "The general rule is, that, where a case
has been decided by this court and again comes here by ap-
peal or writ of error, only such questions will be noticed as
were not determined on the former appeal. . . . These
cases show that exceptions have been made to the general
rule. The present case, however, comes within the general
rule, for the question here decided was not considered on the
former appeal."

In Hickman v. Link, 116 Mo. 123, Judge BRACE says: "On the second trial some new evidence was introduced, cumulative in its character, and in no way changing the complexion of the issues between the parties.. It is, therefore, unnecessary to re-state the case. The law of the case was' maturely considered, settled and clearly stated in the opinion of the court rendered by BLACK, J., and will not be again discussed. . . . If, upon another retrial, which will have to be ordered, the court below will be content to consider the law of the case as definitely settled by our former decision, etc."

Judge MACFARLANE, in Gwin v. Waggoner, 116 Mo. 151, says: "There can be no doubt of the correctness of the general proposition that, 'when a case has been decided in this court, and again comes here on appeal or writ of error, only such questions will be noticed as were not determined on the previous decision; whatever was passed upon will be deemed *res adjudicata* and no longer open to dispute or further controversy.' Overall v. Ellis, 38 Mo. 209. For there would be no end to a suit if every litigant could, through repeated appeals, compel a court to listen to criticisms on its opinions or speculate on chance for changes in its members. . . . Notwithstanding the doubt that must arise from the apparent inconsistencies in these decisions as to the circumstances under which exceptions and qualifications will be made, we think it can be safely said, without going outside any of the cases, that in order that a decision may operate as an estoppel on a subsequent appeal of the same case, the question must have been fairly presented ·to the court as necessary to a decision in the case and directly considered and decided. Parties should not be concluded upon questions that are decided by mere implication arising from the general disposition of the case or those which were merely collateral to the matter actually considered."

Judge SHERWOOD, in Kelly v. Thuey, 143 Mo. 437, says: "The further contention is made that the opinion in Thuey v. Kelly, 102 Mo. 522, is an adjudication of the facts at issue. The testimony in this case is entirely different from what it was when the case was here before, so the special judge has stated. . . . But there were no directions given in remanding the cause. So that there was no adjudication made and the matter remains as it was at first, unhampered by anything which occurred 'on a former appeal. It would be of most pernicious consequence if every error which occurs in this court should bind the parties litigant on a retrial."

I will notice two cases which this court held to be exceptions to the general rule. Hamilton v. Marks, 63 Mo. involved the law of negotiable paper, and Judge WAGNER said (p. 172) : "But, in view of the fact that subsequent decisions of this court, though not noticing or professing to overrule the decision in this case, are, in my opinion, inconsistent with it, and considering the great importance of having some settled and stable rule in reference to a question which so vitally concerns the business transactions of the whole community, it is deemed admissible to depart from the usual practice and consider the question again."

Also the case of Wilson v. Beckwith, 140 Mo., where Judge GANTT says (p. 369) : "We are urged to reconsider and overrule the opinion announced on the former appeal in this case. In view of the gravity of the question involved and the consequences that must follow our adherence to the ruling therein made, we have thought it proper to examine again the reasoning upon which that decision is based. In so doing we inaugurate no new practice in this court. In the recent case of Bird v. Sellers, 122 Mo. 32, the title to certain real estate was in dispute and the revenue law of the State was under consideration, and it appeared that the same

matter had been decided by the second division of this court, but the first division came to a contrary conclusion, and BRACE, Judge, speaking for the court, said: 'Although the general rule is that whatever has been once passed upon here on appeal will in the same case upon a second appeal be treated as no longer open to dispute or further controversy, yet this is not an inexorable rule without exceptions, but has been frequently departed from when such adjudication has been found to be wrong, not in harmony with other decisions of the court, and no injustice or hardship would result from overruling the former decision.' . . . Inasmuch then as this case involves a question of title that may and probably will affect the ownership of at least ten thousand acres of land similarly situated, and the litigation has been kept alive during all the time that has elapsed since the former opinion, it can not with much confidence be asserted that it has been accepted, or acquiesced in, so as to have become a rule of property, certainly not one of very long standing."

The rule from these decisions, it seems to me, can be stated in this way: If neither the evidence nor the instructions have been materially changed upon a retrial, then the opinion of this court is the law of the case upon another appeal as to all points considered and actually decided, where they have been fairly presented—no mistake having been made in regard to the record in the case—and where no decision of this court has been overruled inadvertently.

When a case like this is reversed and remanded, it is in effect a direction to the court to retry it according to the law as declared in the opinion, and to decline to do so, would at least subject the trial court to criticism.

Instruction number 1 was given at each trial and there was no material change in the evidence upon the question of defendant's negligence, hence under this rule, the opinion on this subject is the rule of the case.

But as I do not know how many of the members of this court will agree with me in this, and as my opinion will not change the result, I deem it best under such circumstances, to consider the question an open one.

II.   Plaintiff lived upon a farm about five miles from Rich Hill.   She left home about 8 o'clock a. m., and was hurt about an hour afterward at a point where the tracks of defendant crossed a county road—one of the principal roads leading into said place.   The day was clear, her team was gentle and the crossing was well known to her.   These tracks cross the road at a right angle, or nearly so, running east and west.   There were two switch tracks which came together at the crosing.   The switch tracks were south of the main track, and it was twenty-five feet from the south line of the main track to the switch track.   At the time plaintiff was hurt, she was going north.   West of the crossing, and standing along one of the switch tracks sixty-four feet, was a coal platform seven feet high.   The east end of the platform was one hundred and nine feet from the middle of the road.   Twenty-five and one half feet west of the platform and to the south of it, was an engine house into which ran one of these switch tracks; its front was toward the crossing, and it had a depth east and west of sixty-three and four-tenths feet.   This crossing was near Rich Hill and the defendant had yards upon both sides of it.

The conductor says that after he left the Rich Hill depot, he took some empty cars, so that when he passed the Missouri Pacific crossing—which was from a quarter to a half of a mile west of the engine house—his train was as follows: First the engine and caboose, next three coal cars and then the five box cars.   It was down grade from this point to the end of the yards.   Just after, to use his language, leaving this Missouri Pacific crossing he cut off the five box cars and got upon the forward car.   He was alone;

the rest of the crew, viz., the engineer, fireman and two brakemen, were with the other part of the train, which went down to a point a little less than one quarter of a mile east of the crossing where plaintiff was hurt, to leave the three coal cars. The conductor says, that at first he set the brakes, in order to let the rest of the train get ahead of him, so that he could attach the box cars to the engine again, at a point upon the main track east of said crossing, after the coal cars had been left, and to this end he was letting the box cars drop down. He was doing this "to avoid making two extra stops." When he had got within four or five hundred feet of the crossing, he noticed the plaintiff's wagon "coming round the corner. . . . I got a little further, I saw this wagon coming down there behind the roundhouse. . . . She was going along in a kind of slow trot, like farm horses do, and as I came on down, I commenced whistling and hallooing, hallooed at her; she didn't pay any attention; didn't seem to be looking either one way or the other; I kept on whistling and hallooing until I got pretty close to the crossing; she was also pretty close and I began to realize maybe she would not see me in time to stop, and I set the brake on the first car and ran back to the second car and set the brake and started for the third car; I realized that the wagon was going to be hit, and didn't have time to set that brake, and jumped down the side of the car and stepped off on the crossing. . . . I realized that the cars might run down and run into the cars and engine and I jumped up on top to stop them. . . . Then I saw the cars were going to stop before they got to the brickyard and I got down and went over to her."

The conductor says that when he first saw plaintiff the brakes were not set and that he began to set them within one hundred feet from the crossing, and in regard to the effect of setting these brakes, he says: "I suppose it did check .

them some; you could not reduce it very materially in such a short distance." He also says he was running about five or six miles per hour when he got to the engine house. Another witness for defendant says the cars were going, when they struck plaintiff, "five, six or may be seven miles an hour." The cars went about one hundred yards beyond the crossing, before they stopped, shoving the hindmost wheels of the wagon in front of them. The conductor says there was a rise in the public road close to the crossing of "may be eighteen inches at the lowest place;" another witness for defendant gives it as from three to four feet. The rest of the train, so says the conductor, at the time of the collision, was "to the best of my recollection, backing in on the brickyard switch." From the Missouri Pacific crossing, the bell of the locomotive kept ringing until it passed the road.

What is the law upon these facts? The court, speaking upon this subject in Railroad v. Converse, 139 U. S. 472, said: "While those using a public highway are under a duty to keep out of the way of railroad cars crossing it, and to exercise to that end such care as the circumstances make necessary, the railroad company, in moving cars upon its road, is bound to observe like care towards those who, while traveling upon such highways, whether on foot or in vehicles, are obliged to pass over its tracks. The right of a railroad company to the use of its tracks for the movement of engines and cars is no greater in the eye of the law than the right of an individual to travel over a highway extending across such tracks. The former is granted, subject to the condition, necessarily implied, that it shall be so used as not unreasonably to interfere with or abridge the latter. The obligation to use one's property in such a manner as not to injure that of others rests equally upon corporations and individuals." [Railroad v. Steele's Administratrix, 54 U. S. App. 550.]

In Hanlon v. Railroad, 104 Mo. 389, Judge MACFARLANE says: "The rule, and the qualification of it, require

precautions to be observed by both the railroad company and the traveler, when using a public highway in common. The precautions to be used by each must necessarily vary, with varying circumstances, and no positive rule can be laid down which can be made a test in every case. One rule for their mutual government is imperative, which is the duty and obligation for each to watch for the presence of the other, one to avoid being injured, the other to avoid causing injury. The railroad company must give some regard to the known imprudence of mankind and not content itself with the mere obedience to the law requiring signals to be given, and the traveler must, in like manner, take precautions for his own safety, and not depend entirely upon the railroad company to protect him, or give him timely notice of danger."

Judge BLACK says in Stepp v. Railroad, 85 Mo. 235: "Railroad companies can not operate their roads, and thereby subserve the public interest, without crossing streets and public highways, and positive law gives them a right so to do, but they are required to give the statutory signal. It is negligence not to give the signal. The safety of human lives and of property, on and off the trains, demands the observance of these requirements as well as reasonable precautions in approaching these crossings. On the other hand, the public have a right also to use these highways at such crossings. It is also the duty of a traveler on the public road to use all reasonable care and caution to avoid injury. He has a right to believe these signals will be given, and on the other hand the company has the right to act upon the supposition that he will take all reasonable care to hear them, and give heed to their warning. It has been repeatedly held by this court that it is the duty of one crossing a railroad track to look and listen for an approaching train, and thus get all the information his eyes and ears will afford him, and if he fails to do this and thereby contributes to the injury, he must suffer the consequences, even though the company may have

been derelict in the performance of its duty in giving the signals."

Judge NORTON says in Petty v. Railroad, 88 Mo. 318: "But assuming that he could, at the distance of two hundred yards west of the crossing, have heard the rumbling noise of a train, and that in fact he did hear it, it does not follow that he was guilty of negligence in proceeding on his way, and for these reasons: The rumbling of the train would simply have imparted to him the knowledge of the fact that a train was running somewhere on the track, not whether it was approaching or going away from the crossing. But conceding that he heard the noise of the train, and that as a prudent man he was bound to know that it was approaching, still it would not be, as a matter of law, negligence for him to proceed on his way, inasmuch as, under such circumstances as are disclosed by the evidence in this case, the deceased might well have concluded that the approaching train was more than eighty rods from the crossing, and that it was safe for him to proceed on his way, relying upon the presumption that the defendant would not disobey the law, in failing to notify him of its approach by ringing its bell or sounding its whistle when it came within a quarter of a mile of the crossing, to which notice he was by law entitled, and which it was the duty of defendant to give. [Johnson v. Railroad, 77 Mo. 546.] The whistle was neither sounded nor the bell rung till the train was within forty-two rods of the crossing, and when the bell was rung or whistle sounded at that distance, the train could not, according to the evidence, pass by deceased from the point where he turned south with his team. So that when he heard the bell rung, or the whistle sounded, as he must have done, he had a right to believe that it was sounded at the distance of eighty rods instead of forty rods, and might, as a prudent man, have acted on the belief that he could pass with his team a distance of fifty feet over the crossing before the train ran

eighty rods, or a distance of one thousand and thirty-two feet to reach the crossing."

In Gurley v. Railroad, 104 Mo. 227, Judge GANTT says that a railroad owes "a positive legal duty" to a traveler upon a public crossing.

In Railroad v. Barnett, 59 Pa. 264, it is said: "Nor is it any excuse or justification that the act occasioning the injury was in itself lawful or that it was done in the exercise of a lawful right, if the injury arose from the negligent manner in which it was done."

It is clear from the dissenting opinion of Judge SHER·WOOD, that Judge BLACK was mistaken when he defined that which was done to be a running or flying switch. If after the engine and caboose had crossed the public road, the coal cars had been cut off while in motion and their speed slackened, or that of the engine increased, so that the latter could pass a switch on the main track, in time for it to be thrown, thereby sending the coal cars by their own motion upon the switch track, a running or flying switch would have been made. But as the facts were stated in the majority opinion, it seems to me that the misnomer did no harm, as the elements of negligence in each case are the same. The supreme court of Illinois, in Railroad v. Hammer, 72 Ill. 350, says: "All know that a flying switch, passing on a track without an engine attached or a bell ringing or a whistle sounding, is and must from the very nature of things, be more perilous to life than a switch made with an engine attached, with the usual signals. The object of having a bell rung, or a whistle sounded at road crossings and places where there is danger of collisions, is wholly defeated by the use of this mode of switching, and when employed it necessarily implies negligence on the part of the company." [See, also, O'Connor v. Railroad, 94 Mo. 150; French v. Railroad, 116 Mass. 537; Brown v. Railroad, 32 N. Y. 597; Railroad v. Converse,

139 U. S. 469; Ferguson v. Railroad, 63 Wis. 145; Ward v. Railroad, 85 Wis. 605; York v. Railroad, 84 Me. 117; Conley v. Railroad, 89 Ky. 405; Breckenfelder v. Railroad, 79 Mich. 560; Stevens v. Railroad, 67 Mo. App. 362.]

It is true, as Judge SHERWOOD says, that most of these cases relate to city crossings. But certainly it can not be that the law has a greater regard for the man in the city than the one in the country. The principle is the same in each case. The law in each case seeks the same object, viz., to give the traveler notice of and to protect him from the passing train. It seeks in each case to compel the railroad to give him an effective warning, for a warning is of no use if it does not warn the one for whom it is intended. It is true that in a city it is more difficult to give that warning, by reason of the many tracks and trains passing on the same in opposite directions, with bells on several engines ringing at the same time, and on account of various obstructions as well as smoke, dust and a variety of noises, hence greater care must be taken by a railroad in a city than in a country. In Railroad v. Converse, *supra,* 474, the court said: "The country road upon which the plaintiff was traveling was not, it is true, much used by the general public. But that fact only affects the degree of care the defendant was bound to observe, and does not establish a right to have its cars approach the crossing, where the plaintiff was hurt, and over which the public were entitled to pass, as if there was no highway there at all."

When defendant crossed the road it was operating "a dangerous agency," but it was a legal one and no one could complain so long as it was used so "as not unnecessarily to interfere or abridge the rights of the traveler upon the road." To save trouble, however, the defendant let these five cars come down across this road by their own momentum, with no engine at either end, so that no bell could be rung or whistle

sounded. They came at a speed of five, six or seven miles per hour, so its witnesses say. True it had its conductor at the front end of the foremost car. The brakes were unset, it may be to get the necessary speed, and when he sees plaintiff's danger, he sets the brakes and stops the cars a hundred yards too late. True he yells or whistles, but he says it did not warn her. Counsel say that there is no statute against doing what it did at this time, and that there is no penalty incurred as in case of an engine going across a road without ringing a bell or sounding a whistle. I agree with them, but when they say that it follows from this that if an engine is not used, and cars alone are run across, that therefore in such case it need give a less effective warning to the traveler, I say it is a *non sequitur*. If the danger is increased by its neglect, I can not see why the law should for that reason suffer a less effective warning.

In the case of Railroad v. Matthews, 7 Vroom, in which all eleven of the judges agreed, the opinion seems to me a conservative one, the court says (p. 534): "Under usual circumstances in the open country, they can run as many trains and at as great a rate of speed, as are consistent with the safety of their passengers. They are not called on to keep flagmen under ordinary circumstances, at cross roads, nor to give any other notice of the approach of their trains than those signals that are prescribed by statute. . . . But while I thus say that these additional burthens can not be imposed by the court upon these companies, I also say at the same time and with quite as much emphasis, that the companies may, by their own conduct, impose such burthens on themselves. If one of them choose to build its track in such a mode as to unnecessarily make the use of a public road which it crosses, greatly dangerous, I think such company, by its own action, must be held to have assumed the obligation of compensating the public for the increased danger, by the use of additional safeguards. The reasonable

and indispensable implication is, that the railway is to be constructed so as not unnecessarily to interfere with the safe use of the public roads; and if a railroad for its own conveniences curves its track as it leaves a deep cut, within a few feet of a highway, and also sees fit to put up buildings close along such track, and by these means, or either of them, heightens the danger in the use of such highway, it seems to me very clear that such company must be held to have taken upon itself the duty of averting such danger by the employment of every reasonable precaution within its power. .. .... The rule is, as I understand it, that when the company has created extra danger, it is bound to use extra precautions."

If a locomotive were to cross a road with no bell or whistle, but with a man in front yelling and whistling, all would declare it to be a puny warning compared with the statutory one; "a desperate makeshift in such a dangerous emergency," to use the language of Ward v. Railroad, *supra*. When a bell is rung or whistle sounded all know at once that it is a warning; there can be no mistake. This can not be said of the yelling and whistling of a man. In Ernst v. Railroad, 35 N. Y. 32, the court said: "So, also, the signals and hallooing were understood differently by the bystanders. One thought they meant to keep off; another to come on the boat; while others did not understand their meaning at all. The whole transaction must have been embraced within a few seconds of time, and the hallooing and gesticulations of the bystanders, even if observed by the deceased, were well calculated to confuse him." So here the yelling and whistling to have been a warning must not only have been heard by plaintiff, but she must also have known from whom they came. In Welsch v. Railroad, 72 Mo. 454, the defendant took shelter under the statute, claiming it did its whole duty by complying with it, and the court agreed

with it. The court quoted a New York case where it was said: "Such signals being in the judgment of the legislature sufficient to protect the public from injury in the use of crossing." From the reports this would seem to be the legislative judgment in this country.

What the defendant should have done under the circumstances is not for me to say. [Burger v. Railroad, 112 Mo. 246.] Beyond a doubt the warning given was far inferior to the statutory one. Doing as it did, it could not give that one, yet it should have done something equally as effective to protect the travelers at the crossing; not to do so is negligence. Of course if the traveler had heard the whistling and yelling, and had known what it meant in time to have kept out of the way, he could not recover even if it might have been done by a stranger.

III. The serious question to me is that of contributory negligence. This is a matter of defense, unless it appears from the evidence of the plaintiff. [Hudson v. Railroad, 101 Mo. 13.]

There was some new evidence on the retrial upon this subject. On account of my respect for the learned counsel of appellant who have done a world of work in this case, I will review the evidence, though I am conscious that my opinion is already too long.

There are six witnesses besides the plaintiff who testify about the accident. The evidence of plaintiff is far from satisfactory and it can not be reconciled. It may be that the part she took in this collision was not an aid to her memory. "I saw the engine and car pass, and of course I drove across the road." "Then of course I started on to go across." "Oh, the train was gone. Then I started on, I knew no more." On examination in chief she says she did stop "to see if anything was coming. I could not see anything, nor hear anything." She says she does not remember how far

she was from the road when the engine passed.   Then she says it passed her when she was not farther than some point in the court room.   She says she saw no cars except those which passed.   On cross-examination she says she did not hear any one hallooing or whistling.   She says, squarely, that she did not stop before the engine passed, and that she stopped afterwards; that when the engine passed "I must have been not far from Mooney's house there.   I don't think 1 was far from that house, but I can't say where I was." She also says on her cross-examination when asked as to the speed of the engine at the crossing, "Well, they wasn't going very fast."   She closes her testimony with this remark, which seems to me to be true: "It seems that I can't just remember everything."   Mooney's front gate. was about three hundred feet from the crossing.   A new witness says that when the accident happened he was on a track about one hundred feet east of the engine house and about fifteen or twenty feet south of the coal platform; that he saw the plaintiff when the engine passed; her team was standing at a point eighty to one hundred feet from the crossing, and that when the engine passed she started to cross the track. He says that some box cars were following behind the train which struck the plaintiff's wagon; that he only saw plaintiff stop this one time; that the box cars were going from ten to twelve miles per hour; that he saw no one on these box cars and heard no one there whistling or hallooing; that after plaintiff started to go across he heard a brakeman on the coal cars which had passed yelling, but he didn't know at whom. Another witness who saw the accident at some distance says that before one gets to the crossing he thinks the ground was four feet lower; that the plaintiff was from sixty to one hundred feet from the track when the engine passed; that because the ground was lower he could not see whether she stopped or not; that he did not see the box cars until she got

on the crossing; that he heard no warning given and that the box cars were going from eight to ten miles an hour. Another who was about sixty feet from the crossing said his attention was attracted by the hallooing of the conductor; that plaintiff was coming along in a walk between the platform and roundhouse; that the conductor was on the front of these cars and began to climb down about the middle of the coal platform; that the attention of the plaintiff was not attracted by the yelling; that she jerked the lines and slapped the horses when she had got pretty nearly over the track. He thinks the engine at the time of the collision had got as far as the brickyard.

On the part of the defense, besides the conductor, the testimony by those who saw the accident, was as follows:

One who was four hundred and fifty feet away heard the hallooing, supposed it was made by the conductor, saw him on the cars, which he first saw by the engine house; plaintiff was then from eighty to one hundred feet from the track; that just before she got to the crossing she slapped the horses with the lines. He didn't see her stop, her team was walking, and as she was coming to the crossing he thinks she was looking toward the engine which had gone by; that her head was turned in that direction. A witness who was to the north of the track heard the hallooing by the conductor, saw the plaintiff go on the track, saw her look toward the box car; she slapped her horses and looked to her as if she wished to commit suicide; she did not see the plaintiff stop. The conductor says that when he got the second brake set plaintiff was crossing. "I didn't see her look either one side or the other until her horses commenced to cross the first track. . . . . . She looked toward me and saw the cars and commenced slapping the horses with the lines, like that." He did not see her stop. Another witness some distance away saw plaintiff when she was hurt; saw her drive

on the tracks just after the engine passed; did not see her stop; just after she went on the track she gave her lines a "little flap." Saw a man on the car, he was setting the brakes. Another witness one hundred yards to the east was attracted by the hallooing of the conductor; the plaintiff was coming on the tracks when he heard the hallooing. She did not stop.

Plaintiff also introduced evidence tending to show that there was coal upon the platform which came above it, and that there were box and coal cars standing on the switch tracks near the engine house. There was a great variety of evidence by many witnesses tending to show that from various points one could see, and that one could not see, cars approaching the track from the west.

Now what could the jury have fairly found from this evidence conflicting as it is? The evidence tended to show that plaintiff heard the engine coming and stopped about one hundred feet from the crossing until it passed; that from that point to the crossing her line of vision to the west was, to some extent to say the least, obstructed; that she slowly drove to the crossing, looking to the east at the engine which had passed, and which had the cars attached in such a way as to lead one to believe that it might leave a part of them and come back soon; that when she got upon the crossing, for the first time she saw the box cars bearing down on her; that she became excited and in her excitement did the wrong thing; that she ought to have stood still on the track, or between the tracks where she was; that instead of doing this, she hit her horses and got in front of the moving cars and was hurt.

It seems plain to me that the well known rule of "stop, look and listen" which must govern those who approach railroad crossings in vehicles, was not laid down for such a case as this, and that it does not in any way impair that rule by holding this case to be an exception.

The supreme court of Pennsylvania has always upheld this rule, yet it says in Schum v. Railroad, 107 Pa. St. 11: "What constitutes negligence in a given exigency, is generally a question for the jury and not for the court. Negligence is want of ordinary care under the circumstances; the standard is, therefore, necessarily variable; no fixed rule of duty can be formed which can apply to all cases. A course of conduct justly regarded as resulting from the exercise of ordinary care under some circumstances, would exhibit the grossest degree of negligence under other circumstances; the opportunity for deliberation and action, the degree of danger and many other considerations of a like nature, affect the standard of care which may be reasonably required in a particular case. When the standard shifts, not according to any certain rule, but with the facts and circumstances developed at the trial, it can not be determined by the court, but must be submitted to the jury."

This court in Jennings v. Railroad, 112 Mo. 276, has said, while considering this rule: "Such a general rule of conduct must have grown out of experiences and observations that were common and ordinary; hence the rule, like most others, is not of universal application, but has exceptions under exceptional circumstances. As in Petty v. Railroad, 88 Mo. 308, the whistle was sounded forty, instead of eighty, rods from a crossing, it was held not negligent in law for one to proceed over the track, if he could have done so safely, had the train been in fact eighty rods away. In Bluedorn v. Railroad, 103 Mo. 449, the court says: 'Where as here, there is flagrant violation of a law or municipal regulation, resulting in an injury, contributory negligence should be clearly made out, before the court relieves the defendant from liability on that ground.' [See, also, Kellny v. Railroad, 101 Mo. 76.]"

IV. If plaintiff was thrown off her guard by the neglect of defendant or was lulled thereby into a sense of secu-

rity, so that she went upon the crossing as she did, then her case is an exception to the general rule, providing that a prudent person would have done as she did. If when she got upon the tracks, she saw the cars for the first time, she had three things which she could have done: stop, back or go ahead; but she had no time to deliberate, and if she became excited or possessed by fear, she was in no condition to do so. In her efforts to escape from this sudden peril, all the law demanded of her was that she should do as a reasonably prudent person would have done under such conditions. To say that she could not recover because she was on the track, is simply to say that there are no exceptions to the general rule.

It seems to me that the authorities are all one way on this subject. [Seigrist v. Arnot, 86 Mo. 200; Keim v. Union R'y & T. Co., 90 Mo. 322; Donohue v. Railroad, 91 Mo. 364; Dickson v. Railroad, 124 Mo. 140; McPeak v. Railroad, 128 Mo. 642; Robinson v. Railroad, 48 Cal. 421; Buel v. Railroad, 31 N. Y. 318; Stokes v. Saltonstall, 13 Pet. 191; Linnehan v. Sampson, 126 Mass. 506; Railroad v. Ware, 84 Ky. 267.]

The jury were instructed that the conduct of plaintiff must have been that of an ordinarily prudent person under such circumstances. Judge GANTT, speaking of this rule in Stanley v. Railroad, 114 Mo. 619, says: "This rule has been steadily maintained in this court since that decision. It is one that enables each jury in each recurring case, to say, after a careful survey of all the facts, whether a party has used that care that an ordinarily prudent person would have used under similar circumstances. It is one that is susceptible of practical application. It furnishes the measure required by the law, and leaves to the triers of the fact the determination of the facts and fixing the liability under

that rule. It is sufficiently elastic to meet the most aggravated case, or one containing the slightest negligence. By adhering to it, the trial court avoids the common vice of commenting on the facts and invading the province of the jury."

V. Defendant asked twenty-nine instructions. They were all drawn with great care and skill, born of great experience in this kind of cases; counsel can hardly expect me to discuss each one of them. It would not comfort them, and certainly it would not benefit the profession.

"And if the instructions taken as a whole presented the issues fairly and were not misleading and were not calculated to mislead the jury, it was all that was necessary." [Henry v. Railroad, 113 Mo. 536.]

Counsel complain because number 1, given at the instance of the court, told the jury that they might "consider what influence or effect, if any, the passing of the engine and attached part of the train in question, as the same passed, would have upon the mind and conduct of a prudent person placed as she then was."

They say it was a comment on the evidence. It may be true, as was said by Judge GANTT in Spillane v. Railroad, 135 Mo. 424, that "the instruction is by no means a model and is not to be followed as a precedent," yet, in my opinion it could have done defendant no harm. There is no doubt but that it was proper for them to consider this. Moreover, the court does not comment on it; it did not say what effect they should give to it, only that they might consider what, etc., if any, etc. [Sherwood v. Railroad, 132 Mo. 344.]

VI. Counsel have argued with great earnestness another point, and for fear it may be due to them to mention it in this opinion, I give it in their words: "That, whether Mrs. Baker stopped or looked or listened or whether she did not do so, the testimony shows beyond any question that, if

she had stopped or had looked with any degree of care while yet at a safe distance from the main track of the railroad, she could have seen the approaching cars; that she is chargeable under the Missouri decisions with what she could have seen, and her conduct is therefore to be judged of as though she saw the approaching cars while yet at a safe distance from the main track; that she can not escape on this appeal the result of the foregoing conclusion, which result is that it was her own negligence which directly contributed to the collision with the cars, as on the former appeal it was held she might, namely, for the reason that on that appeal Judge BLACK thought the record showed that she was close to the track when the engine and cars attached passed over it, waited for them to get out of the way, her attention was distracted by them, she was thrown off her guard by them and drove on immediately after they passed the highway and out of her way, thinking she would get over before any other cars could possibly follow; and that such an assumption is not applicable to the facts on this appeal we claim, because her own testimony negatives the assumption, in that it shows positively that she saw the engine with the cars attached to it pass the crossing while she was still a long distance from the track—so far that the engine and the cars did not distract her—but that, instead of being distracted by them, she realized that after they had passed and as she drew nearer the track she must look for other cars; that she intended to so look and thought she did so look. Distraction is a state of mind and any such state of mind on the part of Mrs. Baker was absolutely negatived by her own testimony. Hence I say, whether she looked or listened or did not look or listen cuts no figure in the case, because she thought she ought to look. There is no reason why she should not have looked as she states it, and had she looked at a safe distance she might have seen the approaching danger. Hence the case

is presented like the ordinary crossing case and just as though the engine with the cars attached had never been seen by her."

Her evidence does not show to me that she was a long way off when the engine passed. Her evidence on this point is so vague and contradictory that no one can tell from it where she was when the engine passed. It is so thin on this point that it will not bear an instruction. [Powell v. Railroad, 76 Mo. 84.] To ascertain the fact I must depend upon the evidence upon both sides and from that evidence it appears to me she was not more than one hundred feet from the track when the engine passed and the evidence convinces me that it was but a short period of time between the passing of the engine and the box cars.

Counsel do not admit that plaintiff did actually stop just before she went upon the tracks. Their answer says she did not stop at all, and the evidence clearly shows that she did not stop just before she attempted to cross, but they claim that inasmuch as she contradicted herself on this point, and swore to what was not true, that nevertheless this tends to show that she was not confused when she went upon the tracks. In other words, that she must fail to recover on account of the neglect of defendant, because she has made this mistake in her testimony.

I think no weight should be given to this false testimony for any purpose whatsoever. The most that can be said is that her testifying in this way, may possibly be due to her confusion, which existed at the time of the accident.

In my opinion the judgment should be affirmed. It is so ordered. BURGESS, BRACE and WILLIAMS, JJ., concur; SHERWOOD, ROBINSON and MARSHALL, JJ., dissent; GANTT, C. J., having been of counsel did not sit in the case.