# CHARLESTON.

## VANCE *v*. RAILWAY CO.

Submitted January 30, 1903.    Decided April 25, 1903.

1. ORDER—*Clerk.*

    An interlocutory order, omitted to be entered by neglect or inadvertance on the part of the clerk of a court, may be ordered, by the court, to be entered *nunc pro tunc,* by way of amendment, so as to make the record show what has actually transpired in the cause, upon clear and satisfactory evidence, consisting of uncontradicted affidavits, and papers filed, and orders entered, in the cause. (p. 342).

2. COURT—*Demurrer—Order—Judgment.*

    A mere announcement by a judge in court of his opinion to

sustain a demurrer to evidence, without an order or direction to the clerk to enter judgment accordingly, is not a sufficient rendition of judgment to warrant the entry of it as final judgment *nunc pro tunc*, when it further appears that absence of counsel was the reason for not ordering it to be entered at the time of the announcement.   (p. 343).

3.   DEMURRER.

By demurring ,to the evidence, the demurrant admits, in favor of the demurree, all inferences of fact that may be fairly deduced from the evidence.   (p. 342).

4.   RAILROAD—*Damages.*

Having knowledge of the negligent practice of a railroad company in making "Flying Switches" over a street crossing, came to the crossing on a starlit, but moonless, night, just as an engine was approaching, and after waiting for it to pass, stepped upon the side track on which the cars following the engine were, and was struck and injured by a box-car, so following, without a light or person on it, and without any signal having been given. V. and his father, who was with him, testify that, after the passage of the engine and before proceeding, they looked down the track for cars and saw none. As to the extent of the darkness and whether lights in a passenger coach at the rear of the box cars could, or ought to have been seen by them, the evidence is conflicting and uncertain. *Held:* That on demurrer to the evidence, judgment was properly rendered for the plaintiff.   (p. 346).

Error to Circuit Court, Roane County.

Action by Joseph B. Vance against the Ravenswood, Spencer & Glenville Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

J. W. VANDERVORT and J. P. CAMDEN, for plaintiff in error.

C. E. HOGG and J. G. SCHILLING, for defendant in error.

POFFENBARGER, JUDGE:

The Ravenswood, Spencer and Glenville Railway Company complains of a judgment rendered against it by the circuit court of Roane County for $525.00 in favor of Joseph B. Vance, in an action for personal injury inflicted upon him by the alleged negligence of the plaintiff in error, and one of the principal

grounds of error is that the court entered a *nunc pro tunc* order.

The first order shows the overruling of the demurrer to the declaration, the second, the allowance of compensation to the stenographer, and the third, defendant's demurrer to the evidence and plaintiff's joinder therein. They were made in April and August, 1898. The next was made on the 19th day of April, 1901, as of the 29th day of August, 1898, upon the affidavits of the three attorneys for the plaintiffs, showing that it should have been entered on said last mentioned date, but had been inadvertently omitted by the clerk. That order sets forth the entry of the plea and joinder therein, the impanneling of the jury, demurrer to the evidence and joinder therein and the conditional verdict. On the 27th day of August, 1901, the judgment herein complained of was rendered.

Between the date of the trial and the date of the entry of the *nunc pro tunc* order, Hon. Reese Blizzard, the judge before whom the trial was had, resigned, and was succeeded by Hon. Warren Miller, who entered said order and rendered the judgment. That there had been a trial, demurrer and conditional verdict was not disputed by any counter affidavit, upon the motion for the entry of the order. The affidavit filed was strongly corroborated by the former orders entered, the last one of which showed that there had been a demurrer to the evidence and a joinder therein, and concluded as follows: "And the court takes time to consider of its judgment on the demurrer to the evidence. By consent of the parties the judgment of the court may be handed down and entered of record during the vacation with privilege to either party to file bills of exception at any time before the last day of the next November term of this Court."

As the record left no room for doubt that the interlocutory proceedings omitted from the record had taken place, the only inquiry is as to the power of the court, by amendment of the record, to make it speak the truth. At common law, the courts might amend their records so as to make them truthfully set forth what had occurred, while the proceeding was *in fiere,* but not after the term at which final judgment was rendered. This rule resulted in such great hardship that relief was given by early English statutes. Stat. 1, ch. 6, 14 Edw. III; Stat. 1, ch. 4, 9 Edw. V; ch. 12, 8 Henry VI. See 17 Enc. Pl. & Pr.

919. The amendment complained of here is not forbidden by even the common law rule, for the reason that it was made before judgment. It was a mere interlocutory order. Whether, if final judgment had been entered, and the mistake had afterwards been discovered, the amendment could have been made so as to support a judgment already rendered, need not be decided. As in that case, the amendment would be an alteration of the record after judgment, the rule might be different. In 17 Enc. Pl. & Pr. 920, it is said that the rule now very generally obtains that a court may amend its record as to clerical errors and misprisions as well after the term as during it, and, for this, decisions of a great many of the states are cited, including two in Virginia, *Commonwealth* v. *Winstons,* 5 Rand. 546, and *Marr* v. *Miller,* 1 Hen. & Munf. 204. That an interlocutory order may be entered *nunc pro tunc* has been decided by the Supreme Court of the United States, *In Re Wight,* 134 U. S. 136. After quoting from Bishop on Crim. Proc., sec. 1160, Mr. Justice Miller says: "An extensive list of authorities is cited in the foot-note of Mr. Bishop, and among those which support the power of the court to make a record of some matter which was done at a former term, of which the clerk had made no entry, the following cases directly affirmed that proposition: *Galloway, Administrator,* v. *McKeithen,* 5 Iredell (Law) 12; *Hyde* v. *Curling,* 10 Mo. 374; *State* v. *Clark,* 18 Mo. 432; *Nelson* v. *Barker,* 3 McLean 379; *Bilansky* v. *The State of Minnesota,* 3 Minn. 427." To this list may be added *Steenrod's Admr.* v. *Railroad Co.,* 25 W. Va. 135; *Miller's Admr.* v. *Cook's Admr.,* 76 Va. 806; *Wright* v. *Strother,* 76 Va. 857; *Kendrick* v. *Whitney,* 28 Grat. 652; *Knefel* v. *People,* 187 Ill. 212, 79 Am. Dec. 217; *Kaufman* v. *Shain,* 111 Cal. 116, 52 Am. St. Rep. 139; *Frink* v. *Frink,* 43 N. H. 508, where it is said: "But the court has authority to amend its records so as to make them conform to the actual facts and truth of the case; and may in its discretion, receive and act upon any competent legal evidence;" *Davis* v. *Shaver,* Phillip's Law (N. C.) 18, 91 Am. Dec. 92; *Weed* v. *Weed,* 25 Conn. 337. The principal objection to the entry of this order seems to be that the date of the certificate of the stenographer to the evidence set forth in the demurrer is later than the date of the order, from which it is argued that the evidence in the case was not embraced in the demurrer

to the evidence. The demurrer and joinder therein are formal and regular in all respects and are made a part of the record, it being recited in an order entered August 30, 1898, that they were filed. The evidence is incorporated in them, and there is nothing to indicate that it is not the evidence adduced in the case but the late date of the stenographer's certificate. The record shows inferentially that there was a stenographer sworn in the case and the evidence incorporated in the demurrer is certified by the same person who was allowed compensation as stenographer, and the court, no doubt, had other evidence before it tending to show that the evidence inserted in the demurrer is the evidence given upon the trial, and its finding upon that matter cannot be overthrown because of the mere fact that the stenographer certified the evidence as of a later date. No authority is cited for the contention on this point, and it is not believed that there is any authority of that kind.

After said order was entered, the defendant moved the court to enter final judgment for it *nunc pro tunc,* as of the August term, 1898, and the action of the court in overruling that motion and declining to make the entry is assigned as error. In support of this motion, the defendant presented the affidavit of the retired judge who had presided at the trial, setting forth, in substance, the proceedings, and stating that, at said August term, he had "rendered his opinion upon said demurrer to the evidence, and sustained said demurrer to the evidence," but "judgment was not entered in accordance with the opinion of the court, so rendered, because counsel for the defendant were non-residents of Roane County, and none of them were present to see that a proper order was prepared and to ask that the same be entered." In a valuable note appended to the report of *Ninde* v. *Clarke,* 4 Am. St. Rep. 823, giving a long list of decided cases bearing upon the question, it is said: "There are two classes of cases in which it has been held proper to enter judgments and decrees *nunc pro tunc.* The first class embraces those cases in which the suitors have done all in their power to place the cause in a condition to be decided by the court, but in which, owing to the delay of the court, no final judgment has been entered. The second class embraces those cases in which judgments, though pronounced by the court, have, from accident or mistake of the officers of the court,

never been entered on the records of the court." The cases
falling within the first class mentioned nearly always arise
from the death of one of the parties, after submission of the
cause and before judgment is actually rendered, and it
becomes necessary to enter judgment *nunc pro tunc,* in order
to prevent the other party from being prejudiced by the delay
of the court, and without fault on his part. So, in *Spring-
field* v. *Worcester,* 2 Cush. 52, while judgment was suspended
to permit a hearing of reserved questions of law, the statute
upon which the action was brought, was repealed without a
saving clause, and the court ordered judgment to be entered
as of a day prior to the date of the repeal of the statute, as any
judgment rendered subsequent to the repeal would have been
subject to reversal. From the nature and purpose of this rule,
allowing judgments *nunc pro tunc* of the first class, it is mani-
fest that, if no judgment was rendered at the August term,
1898, no sufficient ground existed for entering it as of that
date. The second class of cases includes those in which formal
judgment has been pronounced by the court, but not entered
in the record by reason of some accident or mistake, or through
the neglect, omission, or misprision of the clerk. The court
which has ordered a judgment, which the clerk has failed
or neglected to enter in the record, has power, even after the
term at which it was rendered has passed, to order the judg-
ment so rendered to be entered *nunc pro tunc,* provided there
be satisfactory evidence that the judgment was rendered as al-
leged, and of the nature and extent of the relief granted by it.
The affidavit offered in support of the motion, clearly shows on
its face that the omission of the entry of the judgment which
the judge says he rendered, was not the result of negligence,
mistake or misprision of the clerk. He says that judgment
was not entered in accordance with opinion because counsel
for the defendant were non-residents and none of them were
present to see that a proper order was prepared and to ask that
the same be entered. The clerk was not ordered to enter any
judgment. Hence, it cannot be said that any judgment was
rendered, even if the court had announced his opinion that the
demurrer should be sustained and his intention to render judg-
ment. Whether, under conditions bringing a case with-
in the rules above referred to, under which a great many of

the courts enter judgment *nunc pro tunc,* this Court would do so and whether, if it did so, it would adopt these rules to the extent to which such judgments have been entered by other courts, cannot be decided here, but even if those rules were adopted to their fullest extent, they did not warrant the entry of such judgment under the conditions existing at the time the court overruled defendant's motion therefor.

Next, it is insisted that the court should not have rendered judgment for plaintiff, after overruling the motion for judgment for the defendant, holding that the plaintiff was guilty of contributory negligence. The facts disclosed by the evidence are, substantially, as follows: The town of Spencer is the terminus of said railroad, which is a short branch road, running from the town of Ravenswood. On it but few trains are run, and the trains carrying passengers usually consist of some freight cars and one passenger coach at the rear of the freight cars. At Spencer, in front of the station, there are three tracks, the main track running between two side tracks. It was the parctice of the railroad employees, when coming into Spencer with such mixed train, to run down to the station, and, after letting the passengers off, run back on the track some three hundred yards or more, and then, by means of making what is called a "Flying Switch," shift the cars onto the said track next to the station, having first given them such momentum as would carry them to the station, while the engine kept the main track. This was always, or at least frequently, done immediately after the train came in. The plaintiff resided close enough to this crossing to enable him to see how this was done, and he knew that it was frequently done. He testified that he had seen it done a number of times, that he could sit at his house and see the engine cut the cars loose and the engine go up the main track and the cars up the side track, that he could not say how often he had seen that done, and that "lots of time he would not notice, and so did not see it very much, but that as a general rule they put the cars in in that way." Near the station, the three tracks so used crossed a public street, extensively used by the citizens. This street led from the main town of Spencer across the railroad and a creek to what is called East Spencer. On the 27th day of November, 1897, a few minutes after eight o'clock, p. m., the

plaintiff started by this street to go from Spencer to East Spencer where he lived. The train had just come in and, as usual, had backed down for the purpose of "shunting" the cars on the side track as aforesaid. When plaintiff approached the railroad he stopped until the engine passed, and then stepped on to the side track in front of the approaching cars. As he did so, somebody standing at the station called to him, and he endeavored to get off of the track, but was unable to do so in time to avoid injury. The car struck him on the right shoulder, but the blow did not break any bones, although it is alleged, and there is evidence tending to prove, that his shoulder is permanently injured. It was dark, but a starlight night. All the witnesses say there was no moonlight, but it was not so dark but that persons could distinguish one another. The loose train of cars so shifted consisted of a passenger coach and two box cars, the box cars in front of the passenger coach. There was no light on either of the box cars, but the coach was lighted and a brakeman stood on the platform of the passenger coach next to the second box car. Plaintiff testifies that he did not see the cars approaching him nor suspect their coming, and that, after waiting for the engine to pass, he started across without any thought of danger.

It is very well settled that the practice of making "Flying Switches" is deemed by the courts as dangerous, and is negligence on the part of the railroad companies, especially when it is done at public crossings, and without any signals having been given. "The courts have held, with practical unanimity, and often with great emphasis, that the practice called making the "running" or "flying switch," which consists of "kicking" or "shunting" cars forward, in breaking or making up trains, by moving them forward at a rapid speed detached from the engine or from a portion of the train, and then, by checking or increasing the speed of the engine, or of such portion of the train, allowing them to fly forward over public crossings without the usual warning signals by bell or whistle, or any means of giving such signals, and without any other signals than may be afforded by a brakeman standing on such "running" or "flying" cars, and sometimes even when such brakeman is not standing on the front car, or is on some other car, even the rear car—is negligence. Other courts have charac-

terized it as *gross negligence;* and one court has characterized
it as negligence of so *gross* a character as to overcome the de-
fense of contributory negligence, where a boy was run over in
this way while picking up pebbles from the street. The least
that can be said in favor of the practice is that it presents
*evidence of negligence,* to be submitted *to a jury."* See also
sections 1572, 1696, and 1697. The following cases, as well as
many others which might be cited, fully sustain this propo-
sition: *Nuzum* v. *Railway Co.,* 30 W. Va. 228; *Railroad Co.*
v. *Dies,* 3 Am. Neg. Rep. 273; *Carlson* v. *Lynn & Boston R. Co.,*
5 Am. Neg. Rep. 365; *Drain* v. *Railroad Co.,* 86 Mo. 574;
*Delaware L. & W. R. Co.* v. *Converse,* 139 U. S. 469, 35 L.
Ed. 213; *Phillips* v. *M. & N. R. Co.,* 77 Wis. 349, 9 L. R. A.
521; *Brown* v. *N. Y. Cent. R. Co.,* 32 N. Y. 597, 88 Am. Dec.
353; *O'Connor* v. *Missouri Pac. R. Co.,* 94 Mo. 150, 7 S. W.
Rep. 106; *Baker* v. *Kansas City, &c., Co.,* 147 Mo. 140, 48 S.
W. Rep. 838.

In such cases, however, the plaintiff may be barred from re-
covery by contributory negligence. "But while the contribu-
tory negligence of the traveler will unquestionably be a de-
fense in these, as in other cases, yet the solution of the question
what is contributory negligence is undoubtedly modified by
the fact of the gross negligence or misconduct of the railway
company in thrusting detached cars over the crossing without
warning, after the passage of the main portion of the train
has tempted the traveler into the belief that the danger is over.
While, as already seen, a traveler, on approaching a railway
crossing, is bound to keep a sharp lookout for approaching en-
gines or trains, yet he is not bound to anticipate that the rail-
way company will commit an act of negligence so gross as to
make a "flying switch" across a public highway; and, in gen-
eral, it is not negligence not to anticipate that another party
will be negligent." Thomp. Neg. sec. 1697.

It is argued here, however, that as the plaintiff has admitted
that he knew it was the practice of the employees of the de-
fendant company to make these "flying switches" at that point
on the coming in of the train, he was bound to take notice of it,
and that the passing of the engine was enough to suggest to
him that this performance was then in process of execution.
So the question is: Was it contributory negligence on the part

of the plaintiff not to have remembered, and guarded against, the known negligent · practice of the defendant company. As to the legal effect to be given to this knowledge on the part of the plaintiff, no authority has been cited on either side bearing direct upon the point. A somewhat similar case is *Woodard* v. *Railroad Co.*, 106 N. Y. 369, in which the person, killed by a car running loose on a side track as these cars were running, had worked on a coal yard near the side track and knew that cars were usually "kicked" on to it, and it was held, that, as he could have seen the approaching car before he stepped on the track, and knew that the track was so used, he undertook to cross in front of the car after having seen it, or did not look when it was his duty to do so, and was, therefore, chargeable with contributory negligence, and that it was error to submit the question to the jury. Three of the seven judges, however, including the Chief Justice, dissented. But the case was unlike this, in the fact that the injury occurred in the middle of a bright clear day, while here, it occurred in the night time. Both the plaintiff and his father who was with him and just a step or two behind him when he went upon the track, and who gave the alarm which caused him to wheel around in an effort to escape, say they looked down the track to see if there were any cars coming and did not see any, before the plaintiff went upon the track. As already stated, the moon was not shining and the testimony is conflicting as to the degree of darkness. In order to hold, as matter of law, that the plaintiff was guilty of contributory negligence, the court would be bound to say, as in the New York case, that the plaintiff either did see the cars coming and took upon himself the risk of danger in attempting to cross in front of them, or that he could have seen or heard them coming if he had looked and listened. Whether he could have either seen or heard them coming depends upon the extent of the darkness of the night, and the amount of noise made by the engine. These are purely questions of fact, and as to them a reasonable inference may be drawn either way from the evidence. Under such conditions it cannot be held that there was contributory negligence on the part of the plaintiff. To this it may be objected that, as the plaintiff knew of the negligent practice of the defendant railroad company, he was bound to wait a rea-

sonable time for the passage of loose cars which he might reasonably have supposed were following the engine. That is not tenable for the reason that it does not appear that he had knowledge of the further negligence of the railroad company in making these "flying switches" in the night time without any light on the front of the loose cars, or without a brakeman or other person standing on the front end of the car to give warning to pedestrians of their danger. It is true the coach on the rear of the box cars was lighted, but there is nothing to show that the plaintiff could have seen the lights on the coach. Whether he did see them, or ought to have seen them, is also a question for the jury, as there is room for a reasonable inference either way, the demurrant has given plaintiff the benefit of the doubt.

By demurring to the evidence, the demurrant admits, in favor of the demurree, all inferences of fact that may be fairly deduced from the evidence. *Mapel* v. *John,* 42 W. Va. 30; *Talbott* v. *Railroad Co.,* 42 W. Va. 561; *Garrett* v. *Ramsey,* 26 W. Va. 345. "The evidence upon a demurrer to the evidence should be interpreted most benignly in favor of the demurree; so that he may have all the benefit, which might have resulted from the decision of the case by a jury, the proper forum from which the decision has been withdrawn by the demurrant." *Garrett* v. *Ramsey,* (Syl. 3), approved in *Gunn* v. *Railroad Co.,* 42 W. Va. 676.

The judgment being clearly right, it must be affirmed.

*Affirmed.*