CITY RAILWAY COMPANY v. A. Q. THOMPSON.

Decided December 3, 1898.

**Street Railway—Negligence of Motorman.**

It is the duty of the motorman in charge of a street car to look ahead not only along the track to see that the way is clear, but on each side of it to see that no one, because of obstructions in the street, is about to cross the track, and to avoid a collision with vehicles so crossing the track because of obstructions.

APPEAL from Tarrant. Tried below before Hon. W. D. HARRIS.

*Orrick & Terrell*, for appellants.

*Gillespie & Smith*, for appellee.

HUNTER, ASSOCIATE JUSTICE.—This suit was brought by A. Q. Thompson in the District Court of Tarrant County, against the City Railway Company of Fort Worth, to recover damages for personal injuries alleged to have been sustained by his wife on account of a collision, caused by the negligence of defendant's servants, between one of its electric cars and the buggy in which his wife was riding on Jennings Avenue, one of the public streets of said city, on the 16th day of November, 1895.

The negligence charged was as follows: "Plaintiff says that the injuries so inflicted upon his said wife were caused through the carelessness and negligence of the defendant's agent and servant, the motorman then in charge of said car; that the said motorman, although he knew or could have known by the exercise of ordinary care and diligence, that the said Mrs. Thompson was in a perilous situation, though the same was unknown to her, failed to give any notice or warning of any kind that said car was approaching; that plaintiff's said wife was driving along said street near the track of the defendant, being still unaware of the approach of said car from behind, and attempted to pass around a wagon, which obstructed the passage on the side of the street on which she was driving; that the defendant's agent and servant in charge of said car knew or could have known by the exercise of ordinary care and diligence, that plaintiff's wife would be necessarily compelled to drive on to said track, in order to pass around said wagon, and discovered or could have discovered by the exercise of ordinary care and diligence the perilous situation of plaintiff's wife, in time to have stopped said car, and thereby prevented the collision which occurred."

The answer was a general denial and contributory negligence on the part of Mrs. Thompson, in that, being in front of the car, at a safe dis-

tance from the track, and going in the same direction, she negligently and unexpectedly drove on to the track so close in front of defendant's car as to make it impossible for defendant's motorman to stop the car before striking her buggy.

The case was tried by a jury, and verdict and judgment were rendered for $250, from which the street railway company has appealed.

The evidence is conflicting, so much so that a verdict for either party would have been sustained thereby; but the jury having found for the plaintiff, it is evident that they gave credence to the plaintiff's witnesses and to his theory of the case, and we are therefore without power to disturb their finding, as his evidence is sufficient, if true, to sustain it.

The evidence in the record tends to establish that Mrs. Thompson, accompanied by Mrs. Norvell, was driving north on Jennings Avenue in her buggy, with the top up but no side curtains on. The street car in question was going in the same direction. Both had stopped a minute or so before the accident occurred at the Texas & Pacific Railroad crossing, to await the passing of a train, or probably some train switching. When the way was clear Mrs. Thompson, who had observed or had an opportunity to observe that the car was waiting to cross, as she was, drove rapidly across the Texas & Pacific tracks northward, on the east side of the street car track, somewhere from a few feet to nine inches from the east rail thereof.

An ice wagon had stopped to deliver ice at a saloon, and was standing across the east side of the street, and, in order to pass it, she turned to the left, intending to cross the street car tracks to the other side, and as she turned Mrs. Norvell, who remembered that the street car was behind them, looked back and saw the car coming towards them rapidly—at the rate of four and a half or five miles an hour—probably about forty-five feet from them, as plaintiff's evidence tends to prove, and the motorman then looking off to the left, and giving no alarm. Mrs. Norvell exclaimed, "We shall be killed," when Mrs. Thompson turned her head to the left and saw the car, and believing she could not get across the track, pulled her horse back to the right side of the street, off the track; but the dashboard of the car caught the left forewheel of the buggy and crushed it, pushing the buggy about four or five feet before stopping. When the motorman saw the danger the ladies were in, he did all in his power to stop the car, but the evidence tends to show that, by the use of proper diligence, he would have seen their perilous position earlier, and could have stopped the car before reaching them. Mrs. Thompson did not look back to see if a car was coming, before driving on the track. She was in a hurry and did not hear any car or bell, and did not know of any danger or think of any, when she turned to cross the track.

The street was unobstructed, and the motorman could have seen her, and could have seen that the ice wagon obstructed her side of the street, for more than a hundred feet ahead of him. The defendant's evidence tends to prove that she drove on to the track about ten or fifteen feet from

the front end of the car, and that with the appliances at hand it was impossible to stop the car before striking her; but there is evidence also tending to show that by reversing the machinery of the car, and putting on the brakes, the car could have been stopped in from five to ten feet, one of appellant's employes testifying that, "if the brake is thrown on and the power reversed about four or five points, it would stop the car wheels right then, and if they go forward they will slide, and that, running four or five miles an hour, the car would possibly slide five feet."

We have carefully considered all the assignments of error, and overrule them. The questions raised therein are of such a character that discussion thereof would not be of benefit to anybody. The charge of the court was unobjectionable, and the special charges asked and refused were mostly charges on the weight of the evidence, or when correct the court had already given them in the main charge. The evidence as to the injury sustained and amount of damages, though quite conflicting, is sufficient, we think, to sustain the verdict.

The principles of law touching the duty of a street railway company, while propelling its cars through the streets of a busy city like Fort Worth, to keep a lookout ahead, not only to avoid injuring persons discovered to be in peril, but to discover them on the track or approaching the track where they are likely to be injured, are so fully and ably discussed by Justice Brown in Street Railway Company v. Mechler, 87 Texas, 631, and the rule is there so clearly laid down that it were useless labor for us to attempt to do more than cite the case. The learned judge, speaking for the Supreme Court in that case, lays down the general rule thus: "The person operating the car must exercise that amount of vigilance that a man of ordinary prudence would have exercised under the same circumstances. This may under some conditions require the use of every available means to avoid the injury, but it is after all ordinary care in degree, because a man of ordinary prudence under like conditions would do the same thing; yet it might be the utmost care or great care as regards the quantum of diligence, because the particular circumstances demanded that much."

He cites approvingly the rule as stated by the Supreme Court of Missouri in Winters v. Cable Railway, 99 Missouri, 517, where the court says: "It is the duty of defendant's servants to be on the lookout and to take all reasonable measures to avoid injuries to persons who may be upon the streets. The duty to be on the watch is no more than ordinary care under such circumstances. The care to be used, to be ordinary care, must depend upon the surrounding circumstances." See also Street Car Co. v. Renkin, 38 S. W. Rep., 829.

Considering these rules, and applying them to the facts in this case, it seems to us that it was the duty of the motorman in charge of this car to look, not only ahead on his track to see that his way was clear, but to look on each side of his track to see that no one was about to get on it, and that no conditions or circumstances presented themselves which would evidently compel persons then in his view passing along the street

to go upon the track in front of his car, such as were disclosed here by the position of the ice wagon and the position of the ladies and the course they were driving. If he saw the buggy and the ice wagon, as in the exercise of ordinary care he should, he evidently saw that it was extremely probable that these ladies, in order to pass the ice wagon, would drive on to the track at that place, and he should have been on his guard ready in a second's time to bring into requisition all the power and every appliance he had at command to stop the car and avoid injury, if it were possible to do so.

The appellant's motorman in charge of the car testified that the car was ten or fifteen feet from the buggy when it turned to go on the track, and that it was then five feet from the track. He was sounding his gong, he says, and had been since he crossed the railroad—a hundred feet or more back—and that he set the brakes as tight as he could as soon as they started to the track, but he does not state that he reversed his machinery, and this reversing, it seems, is the most efficient mode of stopping the car. If both forces had been applied, the car could have been stopped in five feet, and consequently the injury averted.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

Writ or error refused.