# CHARLESTON.

MARY M. DIMMEY V. W. VA. TRACTION & ELECTRIC CO.

Submitted April 8, 1919.    Decided April 15, 1919.

1. STREET RAILROADS—*Operation—Lookout—Warning.*

A city or interurban railway company operating trolley cars on tracks laid in a public highway is under a legal duty to maintain a constant and careful lookout for persons using the highway, or approaching or standing by it, with apparent purpose to enter upon it, under circumstances likely to result in injury to them from the progress of a car; and also, upon seeing any person in such a situation, to give warning of the approach of the car. (p. 758).

2. SAME.

Upon the approach of such a car running at a high rate of speed, to a point at which a gate constituting the usual entrance to residence property gives direct and immediate access to the highway from the residence, the space between the railway track and the gate being only about four feet, after having been hidden from view by a curve in the track, it is the duty of the railway company, through its motorman in charge of the car, to keep a close and careful lookout for any person likely to attempt to cross the track from the residence, and, on discovering him, to give warning of the approach of the car, and its failure to do so in negligence. (p. 758).

3. SAME—*Lookout—Passenger Cars.*

If a car approaching such a gate in such manner is closely following another on the same track, with knowledge on the part of the motorman in charge of it, that cars ordinarily pass such point at intervals of several minutes, the duty of vigilance and warning is intensified by this circumstance, as well as by his knowledge that a person standing at the gate or approaching it, if seen by him, has his attention engaged at the time by the preceding car and one going in the opposite direction on another track. (p. 760).

4. SAME—*Crossing Track—Contributory Negligence.*

The attempt of a person to cross a highway and tracks under such circumstances, after having looked both ways for cars without discovery of the second or following car, it being on the curve and out of the range of vision, and after having waited until the car preceding it and another going in the opposite direction on another track had passed, does not amount to contributory negligence on his part, as matter of law, he having been struck and injured by the following car, in such attempt, and it having given no warning of its approach. (p. 761).

5. SAME—*Injury on Track—Negligence..*

    Under the circumstances above indicated, the issues as to negligence on the part of the railway company and contributory negligence on the part of the person injured are properly determinable by a jury, and cannot be withdrawn from it by the court. (p. 761).

Error to Circuit Court, Ohio County.

Action by Mary M. Dimmey against the West Virginia Traction & Electric Company. Judgment for defendant, and plaintiff brings error.

*Reversed, verdict set aside, new trial awarded.*

*Fred L. Maury* and *Jones & McGinley,* for plaintiff in error.

*Charles J. Schuck* and *John J. Coniff,* for defendant in error.

POFFENBARGER, JUDGE:

The inquiries arising upon this writ of error to a judgment for the defendant, rendered on a directed verdict in an action for personal injuries, are, (1) whether the defendant was negligent, and (2), if so, whether the plaintiff was guilty of contributory negligence barring right of recovery.

The defendant owned and operated a double-track electric railway on a public highway known as the National Road on which the plaintiff's residence property abutted. This traction line extended from a point on or near the boundary line between Pennsylavnia and West Virginia and close to the town of West Alexander, Washington County, Pennsylvania, to the City of Wheeling. For the most part, it was located on the National Road, but at certain places it seems to have deviated therefrom. Immediately in front of the Dimmey residence, however, it was entirely on the public highway. At least, the jury could have found from the evidence that it was. What is called the inbound track was on the side of the road nearest the plaintiff's residence, and the rail of that track nearest the residence is only about four feet distant from the gate and the property line. Along the front of the residence property, there was an iron fence hav-

ing three gates, a small one in front of the house, a double one in front of the stable about fifty or sixty feet east of the house and another about thirty-five or forty feet west of the small gate. Within the yard and at a distance of five or seven feet from the fence there was a row of trees about twelve years old. A short distance east of the stable, there was a slight curve of the road and railway track toward the north, but they came back into view from the yard at a distance of three or four hundred feet or less. Plaintiff's husband testified that the track was not visible for some distance beyond the stable, from any point within the yard or from the gate, but he admitted that it was visible throughout the length of the curve, from the track in front of the gate. He further said cars approaching from the east could be seen from the gate, at a distance of only about seventy-five feet, on account of the curve, but did not say what obstructed the view of the curve.

The plaintiff was injured on the 10th day of July, 1916, at about five o'clock P. M., while endeavoring to cross the defendant's tracks, to obtain bread from a baker's wagon standing in the highway beyond them and in front of her residence. Coming from her house to the gate, she held up two fingers to indicate to the baker that she desired two loaves of bread. Looking to the east after having arrived at the gate, or while on the way to it, she discovered an inbound car approaching, and looking to the west, she saw an outbound car coming. After having waited until both had passed the gate, she made one or two steps from the gate and was struck by another inbound car following the one that had first passed, and severely injured. She says the first inbound car and the outbound car passed each other at a point about thirty-five or forty feet west of the front gate and that she stepped out from the gate just as the rear of the outbound car passed it. If she is correct in this, the car that struck her must have been within fifty or sixty feet of the gate at the time at which the other two cars passed each other. She did not reach the track at all. It was only about four feet from the gate and the overhang of the car left a space of only about two feet between it and the gate, and it

struck her as soon as she stepped outside of the gate. The situation in which she was found after it had passed tends to confirm her statement as to her position at the instant of contact. She was found not on the track, but to the right of it, near the fence and fifteen or twenty feet from the gate. She may be mistaken as to the position of the outgoing car at the instant of her fatal step, for the baker and his grandson both say their view of her and the gate was obstructed by the outgoing car at the time of the accident. They say the second inbound car was about six feet from the gate, when their view was shut off by the outbound car.

All of the cars were running at the rate of about twenty-five or thirty miles per hour. The plaintiff swears the first inbound car sounded its gong before it reached the gate, but that the other did not do so nor give any warning of its approach. The baker and his grandson say the second one sounded its gong at or near the gate. Witness Guimar who was a passenger on the car says it neither rang its bell nor blew its whistle. At that point, the cars ordinarily ran at the rate of twenty or thirty miles per hour, and they sometimes gave warning of their approach, but did not always do so. The testimony of the conductor on the car that struck the plaintiff will bear the inference that there was no definite rule of the company as to warning of the approaches of cars to the gate in question. He said that depended largely upon the man running the car and that some of the motormen gave warning and others did not. A witness who had been a motorman of the company both before and after the injury testified that he had had no instruction as to warning of approaches at the gates, but had been instructed to ring the gong at crossings. Ordinarily, the cars ran in each direction, at intervals of seven to ten minutes, but they often ran very close together, and the plaintiff was fully advised as to the method of operating them.

Whether, under the circumstances stated, the defendant was negligent depends in part upon certain legal principles. Of course, there can be no negligence on the part of one who has omitted no legal duty, nor invaded any legal right of another. Hence, upon every inquiry as to the existence of

negligence, it is necessary to ascertain the relative rights of the parties. A railroad company operating its cars on tracks laid in a public highway has no exclusive right of use of the highway or the part so used by it. Its situation is entirely different from that of a railroad company operating its cars on a right of way exclusively owned by it. The plaintiff had as clear and firm a right to cross the highway, at the point at which she was injured, as the defendant had to operate its cars there. She was in no sense either a trespasser or a mere licensee. While the law of the road is not fully operative, under such circumstances, its general principles apply just as they do at highway crossings of steam railroads. The law imposes upon pedestrians and others using public highways in which railways are operated, the duty of constant and vigilant care and prudence for their own safety. At the same time, it imposes upon the railway company duty, through its agents and servants in charge of its cars, to maintain a constant and careful lookout for persons and property in the highway, and to adopt such rules, regulations and methods of operation as are reasonably necessary to prevent injury to them. *Riedel* v. *Traction Company,* 69 W. Va. 18; 63 W. Va. 522; *City Railway Co.* v. *Thompson,* 20 Tex. Civ. App. 16; *Ashley* v. *Kanawha Valley Traction Co.,* 60 W. Va. 306; *Shea* v. *St. Paul City Ry. Co.,* 50 Minn. 395; *Fenner* v. *Traction Company,* 202 Pa. 265; *Consolidated Traction Co.* v. *Haight,* 59 N. J. L. 577; *Mitchell* v. *Railway & Motor Co.,* 9 Wash. 120; *Murphy* v. *Street Railway Co.,* 73 Conn. 249; *Cowley* v. *Railway Co.,* 106 Wis. 239; *Shea* v. *Railroad Co.,* 44 Cal. 414; *Rasher* v. *Railway Co.,* 90 Mich. 413; *Tashjian* v. *Railway Co.,* 177 Mass. 75; *Barnes* v. *Shreveport City Railway Co.,* 47 La. Ann. 1218: Nellis on Street Railways, sec. 380. Under all of these decisions and many others, it is the duty of a street railway company to maintain a constant and careful lookout for persons on the track and for persons approaching it, with apparent purpose to go upon it, and, if the circumstances are such as to indicate probability of danger to them, from the progress of the car, to give them warning by the sounding of a gong or a whistle, so as to attract their attention and enable them to take measures for

their safety. The circumstances and conditions creating a situation of danger and imposing this duty are necessarily varied and lacking in uniformity, wherefore no legal rule can be prescribed that would accurately define them. Whether they are such on any occasion as to create a situation of danger and impose the legal duty to give warning is, therefore, largely a question of fact for jury determination.

The dangerous character of the plaintiff's private crossing was obvious and as well known to the defendant's motormen as to her, and this fact they were bound to observe in the operation of their cars. It may not have imposed a duty always to sound warnings of the approach of the cars, but it manifestly required the maintenance of a sharp lookout at that point and the giving of an alarm on the appearance of an attempt to use the crossing, under circumstances making it dangerous. Its close proximity to a curve which, the jury might have found under the evidence, obstructed the view of persons about to use it from the north side was a circumstance strongly tending to emphasize the duty of precaution on the part of the operators of the cars. While the speed at which they ran at that point was not necessarily excessive, it was another circumstance tending to increase the danger of the situation, and, consequently, to enlarge the duty of care and caution, which always depends upon the circumstances; what is ordinary care under some circumstances being gross negligence under others, and what is a high degree of care under certain conditions being only ordinary care under others. To these conditions ordinarily and normally prevailing at the point in question, must be added others which came into being on the occasion of the injury. Although cars going in the same direction often ran close together, the evidence was such as would have justified a jury in finding that an interval of several minutes usually intervened between cars going in the same direction, and that the situation created by one closely following another was unusual and abnormal. The motorman of the second inbound car knew this as well as the plaintiff, wherefore he may be deemed to have known that his car would be particularly and extraordinarily dangerous to anyone attempting to use

the crossing at that time. Moreover, if he, in the maintenance of a careful lookout, saw the plaintiff going towards the gate or standing at it and watching the other two cars, it would not be a violent. assumption to say he must have known his comparatively silent approach to the crossing, under such circumstances, might be a means of inflicting injury upon her, or that he ought to have known she might, or probably would, attempt to cross immediately after the passage of the two cars she was watching. He could have seen her at a distance of at least seventy-five feet, and, though he probably could not have stopped his car within that distance, a blast of his whistle or a clang of his bell might have arrested her attention and diverted her from her purpose. The evidence would have sustained the further findings that the motorman could have seen the plaintiff at such a distance as would have made a warning efficacious to save her from injury, and that he either did not maintain a proper lookout or did not give an alarm when he should have done so.

The issue as to contributory negligence on the part of the plaintiff should have been permitted to go to the jury also. She exercised the usual precaution, looking both ways for cars. Had the ordinary conditions obtained, the prudence she exercised would have saved her. At the time at which she looked toward the east for approaching cars, the one that struck her was no doubt on the curve and not within the range of her vision. Ordinarily, no car would have been in its situation at that time. Of course, she knew a car sometimes closely followed another, but she had right to assume that, in such. case, more than ordinary precaution would be exercised by the motorman for the safety of pedestrians, and that he would not, without warning, run his car in such manner as. to preclude her safe passage over the track. This conclusion is based upon an obvious corollary of the duty the law imposed upon the defendant, respecting the operation of the second or following car. Both propositions were applied, under circumstances very similar to those disclosed here, in *Hart* v. *Cedar Rapids etc. Ry. Co.*, 109 Ia. 631. There a vehicle carrying four passengers was struck by a trolley car following another, at a street crossing. After

the first car had passed, the driver looked back and could have seen the second one, if he had put himself in a position to enable him to see all of the track near him, but he did not do so. The carriage top and curtains cut off his view of the track nearest him, for a distance of one hundred or one hundred and fifty feet, and, when he looked, the car was on that part of the track. The court held the case to be one proper for jury disposition on both issues, negligence and contributory negligence. The conclusion here stated finds strong support in *Nuzum* v. *P. C. & St. Ry. Co.*, 30 W. Va. 228; *West Chicago St. Ry. Co.* v. *Nilson*, 70 Ill. App. 171; *Marietta & C. R. Co.* v. *Picksley*, 24 O. St. 645; *Knoxville Traction Co.* v. *Brown*, 115 Tenn. 323; *Conley* v. *Albany Ry. Co.*, 22 App. Div. (N. Y.) 231; and *Chicago City Ry. Co.* v. *Fennimore*, 199 Ill. 9., The decisions relied upon by the defendant in error arose out of circumstances clearly distinguishable from those involved here. In *Bassford* v. *P. C. C. & St. L. Ry. Co.*, 70 W. Va. 280, the decedent had exercised no care at all. He had stepped directly in front of a plainly visible engine, when there was nothing in the situation tending to mislead or surprise him. In *Riedel* v. *Wheeling Traction Co.*, 63 W. Va. 522, the plaintiff had been clearly negligent in her inspection of the track. After having merely looked a short distance along the track, she walked along the street to the crossing and then, without further precaution, stepped immediately in front of a car which she could have heard as well as seen. The facts in *Ferguson* v. *Ohio Valley Elec. Ry. Co.*, 82 W. Va. 323, 95 S. E. 955, were obviously lacking in similarity to those involved in this case. *Jackson* v. *Union Ry. Co.*, 77 App. Div. (N. Y.) 161, bears some resemblance to the Ferguson case, and the court held as matter of law, that the plaintiff had been negligent in attempting to cross the street, under the circumstances, both cars being in plain view. *Doherty* v. *Detroit etc. Ry. Co.*, 118 Mich. 209, involved a situation altogether different and was decided by a bare majority of the court, two judges having filed a vigorous dissent. *Boehmer* v. *Pittsburg etc. Traction Co.*, 194 Pa. St. 313, presented a clear case of contributory negligence. The plaintiff had suddenly driven

on the track in advance of a car, without having looked for it. His view was wholly unobstructed and he could have seen it, if he had merely looked behind him.

Being clearly of the opinion that the case, as presented in this record, is one for jury determination, we will reverse the judgment, set aside the verdict and award a new trial.

*Reversed, verdict set aside, new trial awarded.*