# CHARLESTON.

## NUZUM *v.* RAILWAY CO.

Submitted September 12, 1887.—Decided November 5, 1887.

1. EXCLUSION OF EVIDENCE—DEMURRER.

   Upon a motion of a defendant to exclude from the jury the evidence introduced by the plaintiff, the defendant will be considered as a demurrant, and the plaintiff as demurree, and the motion to exclude as a demurrer to the evidence. (p. 239.)

2. EXCLUSION OF EVIDENCE.

   Such a motion to exclude evidence will be considered as admitting the truth of all the evidence introduced by the plaintiff, (who is treated as demurree,) and all inferences therefrom, that can fairly be inferred by a jury, and as waiving all the evidence on the part of the defendant, (who is treated as the demurrant,) which contradicts that offered by the demurree, and all inferences from his own evidence which do not necessarily flow from it. (p. 239.)

3. EXCLUSION OF EVIDENCE.

   Upon the hearing of such motion, the court should consider the evidence which is asked to be excluded with all the favor, and draw therefrom all the inferences, it would be entitled to, if the party making the motion to exclude had demurred to the evidence; and in such a case, if the party offering the evidence would, on a demurrer thereto by the opposite party, be entitled to a judgment thereon in his favor, then the court should not exclude the evidence from the jury. (p. 239.)

4. RAILROAD COMPANIES—NEGLIGENCE—RUNNING TRAIN IN CITIES.

   If the servants of a railroad company, having in its charge one of its engines and trains running within the corporate limits of a city in this State, to and over a public wharf therein, shall fail or neglect to give notice at least 60 rods before its approach to such

wharf by ringing the bell or blowing the whistle of the locomotive for a sufficient time to give notice of its approach thereto, such failure or neglect is of itself negligence on the part of such railroad company. (p. 239.)

5. Railroad Companies—Negligence—Running Train in Cities.

The fact that pedestrians are accustomed to travel on a railroad at a particular place, makes it the duty of such railroad company to exercise greater caution and prudence in the operation of its road at that place. (p. 241.)

6. Railroad Companies—Negligence—Running Train in Cities.

If such company permit a train of its cars to be moved at that place, without having some of its servants in position to give warning of its approach, and to control its movements, these facts are of themselves acts of negligence. (p. 242.)

7. Exclusion of Evidence.

A case in which it was held that the Circuit Court erred in excluding from the jury evidence offered by the plaintiff, and instructing the jury to find for the defendant.

Statement of the case by Woods. Judge:

This is an action brought in the Circuit Court of Ohio county by Frank P. Nuzum, administrator of George Bunfill, for the use of his widow and only child, against the Pittsburgh, Cincinnati & St. Louis Railway Company, for the recovery of damages for causing the death of plaintiff's intestate by the negligence of the defendant's servants and agents.

The declaration contains three counts. The *first* count avers that the defendant, in the county of Ohio, on the fifth of December, 1881, on the track of a certain railroad running within the corporate limits of the city of Wheeling, in said county, and within the corporate limits of said city, then used and operated by the defendant for the purpose of running steam locomotive engines and cars on and over the same, did carelessly and negligently, with great force and violence, run its cars upon and against the said George Bunfill, and then and there did so greatly wound and injure him that by reason thereof he died, and that his death was caused by the said wrongful act of the defendant. The *second* count substantially avers the same, with the additional facts that, at the time the injury was done, said Bunfill was lawfully and without negligence on his part crossing the track of the defendant's railroad, within the corporate limits of the city of

Wheeling, which injury caused the instant death of Bunfill; and that his death was caused by the negligence and carelessness of the company's servants in failing and wholly neglecting carefully to conduct and run said cars in the corporate limits of said city, and in neglecting to give sufficient signal or alarm on the approach of said cars in said corporate limits of the city of Wheeling, and that his death was caused by such neglect and default. The *third* count substantially avers the same facts, and that defendant, by its servants, did then and there so carelessly and negligently manage and conduct a train of its cars that, by reason thereof, the cars in said train were detached from the engine, to which they had theretofore been attached, and, being so detached and separated, ran with great force and violence against said Bunfill, who was then and there passing in said city near the public wharf, and in the direction of the defendant's passenger depot, and then and there instantly killed him. To this declaration the defendant demurred; which demurrer being overruled, it pleaded "not guilty," on which plea issue was joined. This issue was afterwards tried by a jury; but, being unable to agree upon a verdict, they were discharged.

The issue was again tried by a jury, who on the sixth of October, 1884, rendered a verdict in favor of the plaintiff for $3,000 damages. On the motion of the defendant, this verdict was set aside, and the plaintiff excepted, and his bill of exceptions sets forth all' the evidence offered on the trial.

On the twentieth September, 1886, the case was again tried by a jury, and the plaintiff, to maintain the issue on his part, introduced and gave in evidence all testimony introduced by him on the second trial as set forth in his said bill of exceptions, together with the admissions of the defendant, made to the jury in open court, "that the defendant is, and at the time of the alleged grievance in his declaration complained of was, a corporation, operating, using, and running its cars and engines over and upon the railroad in the declaration mentioned, and that the plaintiff's intestate was *killed on* said railroad at *the time and place* named in the declaration, and thereupon rested his case before the jury; and thereupon the court, on the motion of the defendant, excluded from the jury the testimony so offered by the plaintiff,

on the ground that it was insufficient to sustain the issue on his part, and directed the jury to render a verdict in favor of the defendant, which they did. To this action and opinion of the court the plaintiff again excepted, and moved to set aside the said verdict and grant him a new trial; which motion the court overruled, to which the plaintiff again excepted, and the court, in his last bill of exceptions, certified all the evidence introduced on the trial, and thereupon entered judgment against the plaintiff upon said verdict.

From this judgment, as well as from the judgment setting aside the verdict rendered on the second trial of the issue, the plaintiff has obtained a writ of error.

*R. White* for plaintiff in error.

*J. Dunbar* for defendant in error.

WOODS, JUDGE:

The plaintiff in error assigns as error (1) the action of the court in setting aside the verdict in his favor for $3,000.00; (2) in excluding from the jury the evidence introduced by him on the third trial of the issue, and directing the jury to render a verdict in favor of the defendant; and (3) in refusing to set this last verdict aside, and grant him a new trial.

The evidence introduced by the plaintiff on the last trial consisted of the admissions of the defendant made in open court, as already set forth, and the testimony of sundry witnesses, all of which is fully set forth in the last bill of exceptions. None of the evidence offered by the plaintiff was contradicted or in any manner impeached, and no evidence was offered by the defendant. From the evidence of the plaintiff it clearly appears that the plaintiff's intestate, at the time of his death, was a very large, stout, healthy, sober, moral, industrious man, not quite 22 years of age; that he had a wife to whom he was married on the thirteenth January, 1881, by whom he had one child; that he was capable of making, and did make, a comfortable living for himself and wife, working part of the time while at home raising something for himself or working for others; that during part of the two years preceding and at the time of his death he was employed as a deck-hand on the steam tow-boat

Belle Prince at $25 per month and his boarding; that deceased, between 8 and 9 o'clock in the morning on which he was killed, left the boat at its landing, and walked up a much frequented path leading from the landing to the defendant's railroad, and crossing the same 50 or 60 yards north of the defendant's platform; that, from the point this path intersects the railroad track, a person standing on the track looking north could see an engine or train 300 yards, but looking at the engine from that point you could not see the train; that defendant's passenger depot is at the north end of the public wharf, and its freight depot at the south end of the wharf, more than two squares distant; that defendant's railroad, for a considerable distance north of the point of intersection of said path to the center of the distance between its depots, has a descending grade, and that a switch opened into a side track at a point nearly in front of its passenger depot; that the defendant, in order to transfer the engine drawing the train to its freight depot, to the rear of the train, was accustomed to cut loose the engine from the train in motion at a distance of not less than 800 feet from the switch, and then increase the speed of the engine, and run ahead of the train, so as to reach the switch, take the side track, and await the train, moving by its own momentum and the force of gravitation, until it passed the switch, when the engine would again take the main track in the rear of the train, and push it into the freight depot; that all of the defendant's railroad track, from the point where it was accustomed to so cut loose its engines to its freight depot, was within the corporation limits of the city of Wheeling, and the whole distance between its depots was across the city wharf; that section 9 of the ordinance of the city of Wheeling expressly declared that "no locomotive or train shall be run within the limits of the city of Wheeling at a speed exceeding six miles an hour," and that plaintiff's intestate, on that morning, between 8 and 9 o'clock, was instantly killed by said moving train, at a point not more than 15 yards from the point where said path intersects the defendant's track, by said train moving by its own momentum after the engine had been cut loose, and after it had reached the switch and

taken the side track, which was about 120 feet from the point of intersection of said path and track.

Among the witnesses whose testimony was introduced were three who had the best opportunity of knowing all the circumstances preceding and attending the killing of Bunfill. One of these was B. F. McMeehen, who testified as follows: "I live on the Island, in Wheeling, and I saw the train that killed Bunfill. It was in the morning between eight and nine o'clock. I was standing on the suspension bridge about one-third of the way from the east end of it, and I could see from the bridge clear down to the depot." "When I saw the train, I was on the bridge. It was coming down from above. The engine had loosed from the train, and the party (Bunfill) came up to the railroad, and stepped on the main track, and stepped off to let the engine pass, and presently the engine ran on the switch, and he stepped back again, and this train that was coming after the engine, ran over him. He didn't notice it. After it ran over him I came down to the platform, —down to the depot. They picked up the pieces of him, and put him on a truck, and covered him over." In answer to questions propounded by plaintiff's counsel, he further said: "It was a pretty good train of cars. I judge there were nine or ten cars. I think the engine was running at the rate of 20 to 25 miles an hour, and the rest of the train followed at 8 or 10, maybe more. I can't say whether there were any employes on that train or not. I saw two men jump off from about the middle of the train when about two cars-lengths were under the bridge. I saw no person towards the front part of the train. I think if there had been any one there, I would have seen him, unless he had been between the cars. I did not hear the engine whistle, nor see any signal from anybody, or hear any voice from anybody on or about the train." "I passed over the bridge generally about three times a day, and before Bunfill's death I noticed the train several times; there was no one on it,—no man in front."

William Prince testified that his boat, the Belle Prince, was landed and lay about 50 or 60 yards above the paved wharf. The last time he saw Bunfill alive he was walking up the

30

hill from the steam-boat, just before he got onto the railroad track. The boat lay below the suspension bridge a little piece, between that and the wharf, right where a little path goes down the hill about 50 or 60 yards above the platform. The path bears down the railroad, southward to the top of the track, and strikes the track between 50 and 60 yards from the end of the platform. When he saw Bunfill, he was half-way up the hill from the boat to the railroad track. The next time he saw him he had been run over, and was lying under the third car from the forward end of the train. From the time he saw him going up the bank a very little time elapsed. The witness had not walked more than 20 or 30 steps until he heard the cars jumping the track. · He was then dead,—mangled all up. He did not see the cars strike him, but heard the noise ; but just before he heard the noise of the cars jumping the track he heard the locomotive on the switch whistle "down breaks." About the time the cars ran off the track he saw two men on the train running forward from the aft end of the train to the front. Witness did not see anybody towards the front end of the train. He could have seen them if anybody had been on the front end of the car,—on top of the cars.

It further appeared from the testimony that other boats besides the Belle Prince, for the last six or seven years, had been in the habit of landing near the same path, and that many persons used the path, and except when the water was too high, they could walk between the railroad and the river, and that Bunfill could have so passed on that morning ; that he had been employed on the Belle Prince, off and on for two years, three or four months in the year. From the point on the track Bunfill must have been struck there is a plain view of the railroad for 100 yards above the suspension bridge ; and if standing on the track at the same point, and looking up the road, you could see a train or an engine for 300 yards.

The witness Ourfman, in his deposition taken on behalf of the defendant, but introduced in evidence by the plaintiff, testified as follows : " At the time of Bunfill's death, I was a fireman on the Pittsburgh, Cincinnati & St. Louis Railway. I was present at the time of his death. I was standing on

the engine in the gangway when I heard John Joyce call to Hull to 'look out.' I then heard the crash of a brake-beam, which caused me to look to the ground, and as I did so I saw a man lying in the center of the track with his head south. I turned to Mullegan, the engineer, called to Hull, the brakeman, telling him to stop the train, as there was a man under it." "When I first saw Bunfill he was just leaving the boat down at the edge of the river, and I was on the engine on the main track between the suspension bridge and the station platform, going south." "My engine was not attached to the train. We had cut loose for the purpose of getting the cars in front of the engine. When I first saw Bunfill the engine was between six and seven hundred feet from the south end of the train. I think the engine and cars were in full view of Bunfill from the time I first saw him until the train struck him." "I can not tell where Bunfill was when the engine passed him, as I did not see him after he left the plank at the boat until I saw him under the car." "I suppose the engine had been on the switch three or four minutes before I saw him under the car. I did not.time it, but judge about that long." "I think there were fourteen or sixteen loaded cars in the train that ran over Bunfill after it struck him. I judge the train ran about four car-lengths." "From the point where the path crosses the track I suppose a train can be seen coming from the direction of the water-works at least a *quarter of a mile*. At the time the train struck Bunfill it was running between four and six miles an hour."

Such was the evidence before the jury upon the last trial of the issue in this cause, and the only material question presented by this record for our consideration is whether the Circuit Court erred in excluding the same from the consideration of the jury, and in directing them to find for the defendant. Before a plaintiff is entitled to recover damages for an injury done to his person or property by a railroad company on its railroad track, he is required to prove that the injury complained of has in fact been done by the company or its servants, and in addition thereto such facts and circumstances from which a jury may fairly conclude that such injury was caused by its negligence, leaving out of

consideration any question of contributory negligence. *Johnson* v. *Railroad Co.*, 25 W. Va. 570. "Negligence has been defined by this Court as the doing of something which, under the circumstances, a reasonable person would not do, or the omission to do something in the discharge of a legal duty which, under the circumstances, a reasonable person would do, and which act of commission or omission, as a natural consequence thereof directly following, produces damage to another." *Washington* v. *Railroad Co.*, 17 W. Va. 190. By contributory negligence is meant such negligence on the part of the party injured, in his person or property, that directly, in whole or in part, produces the injury complained of. As a general rule, where a party has been guilty of contributory negligence, he cannot recover from the injury he may thereby have brought upon himself; but such contributory negligence must be such act or acts as he could reasonably anticipate would result in his injury. 17 W. Va. *supra.* What constitutes negligence in most cases is a mixed question of law and facts, and generally what particular facts constitute negligence in any given case is a question for the consideration of the jury from all the evidence before it bearing on the subject, rather than a question for the court; and this is especially true in cases of controverted facts, the existence or non existence of which may fairly be presumed to affect the mind, in a given exigency, as to the question whether the act is negligent or otherwise. Negligence consists in the failing to exercise that ordinary care which a party ought to exercise under the particular circumstances in which he is placed; and therefore a different degree of care is required when there is reason to apprehend danger, from that which is necessary, when none is to be apprehended. 25 W. Va. *supra; Railroad Co.* v. *Ogier*, 35 Pa. St. 60.

The *remote* negligence of the plaintiff will not prevent his recovery for an injury to his property or his person which was *immediately* caused by the negligence of the defendant; for the negligence of the plaintiff which will defeat a recovery must be the *proximate* cause of the injury.

Suffering domestic animals to run at large and stray upon an uninclosed railroad track, where they are killed, is not in general a *proximate* cause of the loss; and hence, although

there may have been some negligence on the part of the owner in permitting them to run at large, such negligence being only a remote cause of the loss, it will not prevent him from recovering from the railroad company the value of the animals, if the immediate cause of their death or injury was negligence of the company's servants in conducting the train; for, although the first and paramount duty of the agents of the company is a due regard for the safety of the persons and property in their charge on the train, yet, so far as is consistent with this paramount duty, they are bound to exercise ordinary and reasonable care to avoid unnecessary injury to animals casually coming on their road, and if the servants of a railroad in charge of a train can, by the exercise of ordinary care, *see and save* domestic animals which have wandered on their railroad, it is *their duty to do so;* and for any injury to animals arising from a neglect of such care the company is liable in damages to the owner. It being the duty of the servants of the railroad company, so far as consistent with their other and paramount duties, to use ordinary care to avoid injuring cattle on the track, they are bound to adopt the ordinary precautions to *discover danger*, as well as to avoid its consequences after it becomes known. *Blaine* v. *Railroad Co.*, 9 W. Va. 252; *Baylor* v. *Railroad Co.*, Id. 270; *Washington* v. *Railroad Co.*, 17 W. Va. 190; *Fowler* v. *Railroad Co.*, 18 W. Va. 579; *Railroad Co.* v. *Smith*, 22 Ohio St. 227; *Railroad Co.* v. *Snyder*, 18 Ohio St. 399.

We have heretofore decided that "the *cause* of an injury, in contemplation of law, is that which *immediately* produces it as its natural consequence; and therefore, if a party be guilty of an act of negligence which would naturally produce an injury to another, but before such injury actually results, a third person does some act which is the immediate cause of the injury, such third person is alone responsible for it, although the injury could never have occurred but for his negligence. The causal connection between the first act of negligence and the injury is broken by the intervention of the act of a responsible party, which act is in law regarded as the sole cause of the injury." *Washington* v. *Railroad Co.*, 17 W. Va. 190; *Blaine* v. *Railroad Co.*, 9 W. Va. 252.

It is the duty of the engineer in charge of a train moving or about to move to give timely warning of its approach to a crossing or other place where the public have a right to go. And it is no less his duty to use all necessary means consistent with the safety of those on the train to prevent injury to a person on the track in front of a train, after his peril is discovered; and this duty the company owes even to a trespasser on its track. The fact that pedestrians are accustomed to travel on a railroad track at a particular place makes it the duty of the servants of the company to exercise greater caution and prudence in the operation of its road at that place, whatever may be the *extent* of duty which the company owes to such persons; and neither a train nor a single car should be moved at such a place without some servant of the company in a position to give warning of its approach, and to control its movements, and a failure to give the statutory signals of the approach of a railroad train is of itself negligence on the part of the company; and if, by such negligence, a party is injured, the company will be liable to him for damages. *Sherry* v. *Railroad Co.*, 10 N. E. Rep. 128. Many of these legal propositions have been expressly decided by this Court, and all of them are founded upon sound legal principles, and a wise public policy. When we consider the vast and rapidly increasing number of railroads, the number of cars and engines employed, together with the fact that they are daily and necessarily coming in closer contact with the large number of persons who usually travel along, across, and sometimes for short distances upon, their tracks, thereby greatly increasing danger to human life, we are not disposed to relax these rules, which even now are scarcely adequate to protect the lives of those who may lawfully cross or walk on the track of a railroad.

In the case in judgment it is not necessary for us to decide that the facts introduced in evidence to the jury, as appears from this record, were sufficient to prove such negligence on the part of the defendant as to entitle the plaintiff to the recovery of damages for the injury complained of; nor are we called upon to determine whether the plaintiff was barred from such recovery by the contributory negligence of his intestate in walking on the railroad track, under the circum-

stances given in evidence.  The real question is whether the court was authorized to withdraw these facts and circumstances from the consideration of the jury.  This Court has decided that a party moving to exclude the plaintiff's evidence from the jury is to be regarded as a demurrant, and the party adducing the evidence as a demurree, although there is in fact no demurrer.  Upon such motion the court should consider the plaintiff's evidence with all the favor, and give it all the force, and draw therefrom all the inferences, it would be entitled to if there was a demurrer filed thereto by the party making the motion to exclude the evidence, and in such case, if the party offering the evidence would on a demurrer thereto by the opposite party be entitled to a judgment thereon in his favor, then the court should not exclude the evidence from the jury.  *Mitchell* v. *Adams*, 8 W. Va. 568; *Johnson* v. *Railroad Co.*, 25 W. Va. 570.  Upon a demurrer to evidence, the demurrant must be considered as admitting the truth of all the evidence introduced by the demurree, and all inferences that can reasonably be inferred by a jury therefrom, and as waiving all the evidence on his part which contradicts that offered by the demurree, and all inferences from his own evidence which do not necessarily flow from it.  And where there is a demurrer to evidence, the question in the appellate court is not whether or not a fact ought to be taken as established by the evidence, but would the court set aside the verdict if the jury on the evidence had so found the fact?  And, if the verdict so finding the fact would not be set aside, such fact ought to be considered as established by the evidence demurred to.  *Fowler* v. *Railroad*, 18 W. Va. 579; *Miller* v. *Insurance Co.*, 8 W. Va. 515; *Muhleman* v. *Insurance Co.*, 6 W. Va. 508 ; *Insurance Co.* v. *Wilson*, 29 W. Va. 528, 2 S. E. Rep. 888.

By section 61, ch. 97, Acts 1882, it is declared : " A bell or steam-whistle shall be placed on each locomotive engine, which shall be rung or whistled by the engineer or fireman at a distance of at least sixty rods from the place where the railroad crosses any public street or highway, and kept ringing or whistling for a time sufficient to give due notice of its approach till such street or highway is reached, * * * and the corporation owning or operating the railroad shall be liable

to any party injured for all damages sustained by such neglect." It only remains to apply these legal principles to the facts in this case, and to determine whether we would have been justified in setting aside a verdict if the jury, upon considering all evidence in the case, had found for the plaintiff.

The rule in relation to motions for new trials, on the ground that the verdict is contrary to the evidence, is that, to justify the court in granting a new trial for such cause, " the evidence must be plainly insufficient to warrant the finding of the jury, " and the court will not interfere with the verdict of the jury on the ground that it is contrary to the evidence, merely because, if upon the jury, it would have given a different verdict. *Grayson's Case*, 6 Gratt. 712; *State* v. *Flanagan*, 26 W. Va. 116; *Vaiden* v. *Com.*, 12 Grat. 717. Of what negligence had Bunfill been guilty at the time he was killed?

He had left the boat and was going over to the Belle Prince office in the city of Wheeling, situated on Water street, 100 yards from the depot. To do so he took a foot-path leading from the boat-landing to the railroad, over which path many persons, without objection from the defendant, were accustomed to cross or walk on or beside the track. About the time he reached the track, he was obliged to, and did, step off the track to allow the defendant's engine to pass him, and waited until it had reached and entered the switch, when he stepped on the track, and walked in the middle of it for a distance not exceeding 45 feet, when he was struck by the train of 14 loaded cars moving at a rate of not more than 10 nor less than 4 miles an hour, and instantly killed. His contributory negligence "hath this much, and nothing more. "

The moving train was the *immediate* cause, and his negligence in so walking on the track was the *remote* cause of his death. It was his duty to use his eyes and ears to guard against the approach of a coming train. He had done so, and seeing the plaintiff's engine coming towards him at the rate of 20 or 25 miles an hour he waited until it was on the switch, when he again stepped on the track, but unfortunately failed to observe the approaching cars which had been cut loose from the engine. If he had looked up the road he could have seen the approaching train for at least 900 feet

as the track for that distance was in full view. He used his eyes to avoid the engine and to see it on the switch about 40 or 50 yards distant, while the noise of the engine passing at the rate of 20 miles an hour probably prevented him from hearing the comparatively noiseless approach of the coming train. No bell or whistle on the locomotive sounded to alarm him, and no signal of any kind was given, nor was there any person on the coming train to observe him or warn him of his peril or to arrest the movement of the train, which, in all probability, could easily have been done in time to save his life. The servants of the company permitted the train to move on, uncontrolled, in apparent disregard of the safety of any unfortunate who might be in its pathway.

If, as we have shown, it is the duty of the servants of a railroad company in charge of its trains, " so far as consistent with their other and paramount duties, to use ordinary care to avoid injuring *cattle* on the track, and that they are bound to adopt the ordinary precaution to *discover danger* as well as to avoid its consequences after it becomes known, " what shall be said of the conduct of the defendant's servants having charge of these fourteen loaded cars, cut off from the engine, moving at the rate of four to six miles an hour on a down grade, along its track across the public wharf, without any person on the lookout to discover or avoid danger? If the deceased could see the train, so could he have been seen by any person on or near the front end of the train in time to warn him of his danger, or to stop the train. If, by adopting the ordinary precaution of having one of the brakemen of the train stationed so that he could observe the track for the distance of 900 feet, he must have observed the peril of Bunfill, and might have stopped the train, or warned him of his danger in time to save his life. The fact that, from the time the train came in sight after it had been cut loose from the engine until Bunfill was killed, no person was visible on the train, no warning or signal of a coming train was given, although it was rapidly approaching a locality where it was known that pedestrians from the boat-landing had for years been accustomed to pass over the railroad track, and that all the movements of the engine and the train, from the time it was first seen until Bunfill was killed, were within the city

limits, and within much less than 60 rods from the public wharf, and that, in open disregard of the statute, no bell was rung nor whistle sounded, until the engine had finished its run and was safe within the switch,—what inferences and conclusions as to the question of the defendant's negligence a jury might have fairly made from a consideration of all these facts and circumstances we are not prepared or required to say, but we cannot say that the case made by this evidence is such that reasonable men, unaffected by bias or prejudice, would be agreed concerning the presence or absence of due care on the part of Bunfill or of the defendant; nor can we say that the facts of this case are so unambiguous that there is no room for *two* honest and apparently reasonable conclusions on that question; nor that, if the jury upon these facts and circumstances had found the issue for plaintiff, we would have felt justified in setting the same aside as unwarranted by the evidence. If, treating the defendant's motion to exclude the plaintiff's evidence as a demurrer thereto, the Circuit Court, considering the same with all the favor, and giving it all the force, and drawing therefrom all the inferences, to which it would be entitled, had rendered judgment thereon in favor of the plaintiff, we could not have said that its judgment was unwarranted by the evidence.

But it is further contended by the plaintiff in error that the Circuit Court erred to his prejudice in setting aside the verdict rendered in his favor on the second trial of the issue for $3,000, and that, for this supposed error, he is entitled to a reversal of the judgment, and to have judgment entered in his favor for the amount of that verdict. It is not necessary for us to indicate what would have been our judgment on that view of the case if it had been presented in such manner as to authorize us to consider it. This we are unable to do; for there is nothing in the record to show or even suggest upon what grounds or for what cause the verdict was set aside. It is true, the bill of exceptions contain all the evidence which had been introduced to the jury on that trial. All this was done before the verdict was found; but the record is silent as to the causes for which it was set aside. Many causes can be conjectured sufficient to authorize or require the court to set aside the verdict. It may

have been because the court deemed the evidence wholly insufficient to warrant the verdict, or. it may have been on account of the misconduct of some of the jury, or the officer having them in charge, or of the plaintiff himself. In the absence of all evidence on this point, we are bound to presume that the verdict was set aside for good and sufficient reasons.

We are therefore of opinion that the Circuit Court did not err in setting aside the said verdict; but we are further of opinion that the Circuit Court did err in excluding from the jury the evidence offered by the plaintiff, and in directing the jury to find a verdict for the defendant, and in refusing to set the same aside, and in refusing to grant the plaintiff a new trial; and that for these errors the judgment of the Circuit Court must. be reversed, with costs to the plaintiff in error. And this Court now proceeding to render such judgment as the Circuit Court ought to have rendered, it is considered that the verdict of the jury be set aside, and a new trial granted, the costs whereof shall abide the result of the trial, and this cause is remanded to the Circuit Court.for a new trial to be had therein, and to be further proceeded in according to law.

REVERSED.    REMANDED.

---

# CHARLESTON.

