H. W. PAYNE, *Admr. of Estate of* J. H. FOSTER

*v.*

THE VIRGINIAN RAILWAY CO., *et al.*

(No. 10011)

Submitted September 14, 1948. Decided November 16, 1948.

KENNA and RILEY, JUDGES, concurring.

*William L. Lee* and *John R. Pendleton,* for plaintiff in error.

*Mahan, White, Higgins & Laird, Chas. E. Mahan* and *Carl B. Vickers,* for defendant in error.

LOVINS, JUDGE:

J. H. Foster was struck and instantly killed by a backing shifter train of The Virginian Railway Company, while he was walking in the yards of the railway company located in the village of Page, Fayette County, West Virginia. This action of trespass on the case, instituted by H. W. Payne, as administrator of the estate of J. H. Foster, against the railway company and H. E. Williams, an employee of the railway company, resulted in a verdict for plaintiff in the amount of ten thousand dollars. The Circuit Court of Fayette County entered judgment on the verdict, to which judgment a writ of error was granted by this Court.

The village of Page is a community of an estimated population of seven hundred to one thousand people, located on the main line of The Virginian Railway Company. The inhabitants of the village engage principally in coal mining and railroading. The village stretches along a creek which flows to the west from the east. Just north of, and parallel to, the creek is a paved highway, and to the south of the creek are the railroad yards of The Virginian Railway Company, running parallel with the creek.

The defendant's shops are located in the westerly portion of the community, while the easterly portion of the village is occupied and used by a coal company and its employees. The railroad yards, in which plaintiff's decedent was killed, extend from the defendant's shops approximately one-half to three-fourths of a mile to the eastern edge of the village. These yards consist of the main line tracks which are nearest the creek, and two or more sidetracks running south of and parallel thereto.

Signs are posted at either end of the yards, reading as follows: "Virginian Railway Property; Keep Off."

Dwelling houses and commercial buildings are located in the eastern portion of the village along both sides of the railroad tracks, and up hollows therefrom. There is a dirt road which crosses the railroad yards in the eastern end of the village at a public grade crossing, and therefrom runs generally parallel to the railroad tracks, in a westerly direction, for a distance variously estimated at four hundred to a thousand feet to another public crossing which is located in the vicinity of the coal company's commissary. It is not disputed that this dirt road is very rough and is seldom used by the residents of the community: instead, it is shown by the evidence, without dispute, that pedestrians walk over and along the railroad tracks at any time and place in going from one part of the village to another. It is fairly well shown by the evidence, and not disputed, that such use of the railroad tracks is made at night, and more particularly on Saturday "payday nights" between the hours of ten and one o'clock. This use of the tracks by pedestrians has existed for a number of years and in recent years has been accentuated by reason of congregating places being recently located along the tracks in the eastern part of the village.

Located in the eastern portion of the village are a theater, a church or churches, and a beer parlor, the latter of which appears to have been a gathering place for many of the people of the village, particularly on "payday" Saturday nights. This beer parlor is located about thirty feet north of the railroad tracks and between the tracks and the creek. In the immediate vicinity of this beer parlor is the easternmost public grade crossing over the railroad yards, hereinabove referred to. A few hundred feet west of the beer parlor is a railroad siding which extends to the north over a bridge across the creek. Underneath this bridge is a footbridge which leads from the highway, across the creek, and up an embankment to the railroad tracks.

On the night of September 15, 1945, a "payday" Saturday, J. H. Foster and his wife, who lived in a house located in a hollow south of, and at a right angle to, the railroad tracks and opposite the coal company's commissary, left their home and went to the beer parlor, where they met Bill Coleman, and drank one bottle of beer apiece. It was then approximately 11:50 P. M., and the beer parlor was closing. Plaintiff's decedent, having purchased a case of beer, left the beer parlor to go home with his wife and Coleman. Having climbed the embankment between the beer parlor and the railroad tracks, they ascertained that an eastbound coal train was located on the sidetrack next to the main line track and was blocking the public grade crossing located near the beer parlor. It is not clear whether this coal train was stopped when they first reached the tracks or was moving. In either event the train started moving, slowly, shortly thereafter.

When the Fosters and Coleman saw the eastbound coal train, they started walking down the railroad track between the main line and the track on which said eastbound coal train was proceeding. It appears that the distance between the tracks was seven to nine feet. Plaintiff's decedent and Coleman were walking in front, carrying the case of beer between them, and Mrs. Foster was following closely behind. Having walked down the tracks for a few hundred feet, they noticed that the eastbound coal train was being pushed by two pusher engines. When they saw the engines, which were then approaching near them, they stepped over on the main line tracks, plaintiff's decedent being just inside the tracks and Coleman being on the southern end of the ties underlying the tracks.

Coleman testifies that when they stepped on the main line track, he did not look for a train which might be approaching from either direction thereon, but he positively testified that he heard none. Mrs. Foster testified that both she and her husband looked in each direction as they were stepping on the tracks, and, seeing and hearing no train, proceeded on the tracks. Mrs. Foster

testified further that after she had walked approximately thirty steps, she and her husband again looked back to the east to see if a train was coming on the main line track from that direction, but failed to see one. After they had walked four of five steps further, they were struck from behind by the shifter train which was travelling at a rate of eight or ten miles per hour, in a westerly direction on the main line track. J. H. Foster was instantly killed; Mrs. Foster received injuries resulting in the amputation of one leg; and Coleman suffered lesser injuries. The accident occurred at a place in the vicinity of the siding which went to the north and near the footbridge, both of which are hereinbefore described.

The shifter train which struck plaintiff's decedent was composed of a locomotive, a tender and a caboose. It had been shifting cars east of the village of Page, and was moving in a westerly direction on the main line toward defendant's shops to turn in the equipment. The caboose was coupled to the locomotive tender and the locomotive was the easterly unit.

As has been stated, both Coleman and Mrs. Foster testified that the caboose by which they were struck had no marker or other lights; that the engine failed to sound its whistle or ring its bell; and that accordingly they did not know of its approach. They are partially corroborated in respect to the lights on the caboose by four other witnesses who arrived at the scene of the accident shortly thereafter, and testified that no lights were then burning on the caboose. Another witness for the plaintiff testified that only one light was burning, and that light was a lantern inside the caboose. A sixth witness testified that "marker lights" were burning on the caboose, but that they were located between the tender and the caboose and not on the westerly end of the caboose.

The conductor, two brakemen, engineer and fireman employed on the train testified that a crossing warning, consisting of two long, a short, and a long blast, of the locomotive whistle was blown for the public grade crossing located near the beer parlor. The members of the

train crew further testified that an electrically-operated bell was ringing continuously from the time they entered the eastern end of the yards until a short time after the accident occurred; and that the rear headlight of the engine, located atop the tender, was burning, although they admit that its rays were partially obstructed by the cupola of the caboose. Each member of the crew also testified there were three lights burning on the westerly end of the caboose. Two of such lights were "marker lights", located near the top at either side of the caboose, which shined red in the direction which the train was moving and yellow in the other three directions. The other light, an ordinary oil lantern with a red glass globe, was hanging from a safety chain drawn across the center of the forward platform of the moving caboose. Four of the members of the train crew corroborated the defendant, H. E. Williams, rear brakeman on the train, who testified that he was standing on the forward platform of the caboose displaying an ordinary electric hand lantern in the direction in which the train was travelling. Williams testified that he saw the Fosters and Coleman, shouted at them, and gave an emergency stop signal with his hand lantern to the engineer; but that it was too late to stop the train or for the deceased to remove himself from the path of the train. No other member of the train crew saw the deceased and his companions until after the accident had occurred.

It is admitted that the air whistle, and angle cock, located on the platform of the caboose, would not operate because the air hose was not connected between the caboose and engine tender. This equipment seems to have been used as a means of applying the brakes when backing and also as a warning to the engineer and to persons on the track when the train was backing.

The testimony of the train crew members is partially corroborated by five other witnesses who arrived at or near the scene of the accident a short time thereafter, and testified that they saw the "marker lights" and the red lantern burning on the caboose.

After the taking of the testimony had been completed, plaintiff offered five instructions, one of which was given as offered, and three of which were given as amended by the court. Defendant offered seven instructions, four of which were refused.

After the rendition of the verdict, defendants moved to set aside the verdict and grant them a new trial, which motion was overruled, and judgment was entered as heretofore stated.

The assignments of error may be summarized as follows: (1) The evidence is insufficient to show actionable negligence on the part of defendants, on which plaintiff could recover; (2) the court erred in giving to the jury plaintiff's instructions Nos. 2 and 3, and in refusing to give defendants' instructions Nos. 1, 3, 3-A, and 6; (3) the court erred in admitting evidence that there was no air connection between the air whistle located on the platform of the caboose and the engine; and (4) the court erred in permitting certain witnesses to testify that they saw no lights on the caboose while it was standing at the place of the accident a short time thereafter.

In considering these assignments of error, but one basic question is present throughout. That question is to determine the degree of care owed by defendants to plaintiff's decedent under the circumstances shown by this record. Generally, all of plantiff's instructions, as given by the trial court and including Nos. 2 and 3, sought to advance plaintiff's theory that defendants owed to plaintiff's decedent the duty "to exercise reasonable care, commensurate with the risk of striking or killing J. H. Foster." The instructions offered by defendants and refused by the trial court generally sought to advance defendants' theory that they owed plaintiff's decedent no higher duty than it owed to the trespassers, which was "not to wantonly or wilfully injure" him. The trial court adopted plaintiff's theory as the law applicable to this case.

The trial court's rulings on the admission of evidence were in accord with plaintiff's theory of the degree of care

required of defendants toward J. H. Foster. Of course, if plaintiff's theory be correct, evidence of any act or omission by defendants, such as a failure or negligent inability to sound the air whistle located on the platform of the caboose or failure to light properly the forward moving portion of the train, was proper to show a negligent violation of the duty to exercise reasonable care commensurate with the risk. However, such evidence would be immaterial and improper, if defendants' theory be correct, unless properly supplemented by a showing of a course of conduct by defendants which would constitute wanton and wilful negligence in the killing of plaintiff's decedent.

Of course, other questions arise by the assignments of error in this case, which are incidental and subordinate to the main question hereinabove stated, and those questions must be determined herein. First of such questions is raised by the giving, as amended, of plaintiff's instruction No. 2. Therein, after stating plaintiff's theory of the duty owed his decedent by defendants, the instruction further sets forth: "* * * And if you further believe from a preponderance of the evidence that the defendants failed to use such care and as a proximate result of said failure, plaintiff's decedent, without fault on his part, although on said track at the time, was struck and killed, then you should find for the plaintiff * * *."

It is to be noted that the instruction is binding, and that defendants' only defense asserted herein, other than denial of primary negligence on their part, is the contributory negligence of plaintiff's decedent. "Ordinarily, when contributory negligence of the plaintiff is relied on as a defense, it is prejudicial error to give for the plaintiff an instruction which directs the jury to find for the plaintiff if certain recited facts are believed by the jury from the evidence, but which instruction does not specifically negative contributory negligence on the part of the plaintiff. The error involved in the giving of such erroneous instruction is not corrected by the giving to the jury of other instructions covering contributory negligence."

*Underwood* v. *Goff,* 131 W. Va. 662, 49 S. E. 2d 847, decided by this Court October 12, 1948; *Skaff* v. *Dodd,* 130 W. Va. 540, 44 S. E. 2d 621; *Bragg* v. *Transfer Co.,* 125 W. Va. 722, 26 S. E. 2d 217; *Nichols* v. *Mining Co.,* 113 W. Va. 631, 169 S. E. 451.

The insertion of the words "without fault on his part" does not specifically negative contributory negligence on the part of plaintiff's decedent. *Bragg* v. *Transfer Co., supra.* It is not even clear from the context of the instruction whether such words modify the manner in which plaintiff was struck and killed, or the manner in which he came to be "on said track at the time." Nothing else in plaintiff's instruction No. 2, as amended, can be construed as an effort to negative J. H. Foster's contributory negligence. Accordingly, we hold that the giving of said instruction is reversible error.

The second of such questions to be determined herein arises from the giving of plaintiff's instruction No. 3, as amended. This instruction, which primarily dealt with the law of contributory negligence, as applied to this case, was prefaced as follows: "* * * if you believe from the evidence in this case the defendants were guilty of some act or omission *as charged in the declaration in this case* which constituted negligence * * *". (Italics supplied). It is the italicized words which are objectionable. While we do not consider the giving of plaintiff's instruction No. 3, as amended, to be reversible error herein, we think it worthy to observe that a "* * * court should not by instructions on the subject of * * * negligence refer the jury to the declaration to determine what the acts of negligence charged against the defendant are. Such acts should be covered by or recited in the instructions." *Mott* v. *Davis,* 90 W. Va. 613, 111 S. E. 603.

Having discussed and determined the questions incidental and subordinate to the basic question presented in this case, we now concern ourselves with said basic question, as hereinabove stated. The degree of care owed by a railroad company to non-passenger third parties injured on its premises is an elusive question often dis-

cussed by the courts of this and other jurisdictions. So far as we are able to determine, no inflexible rule has been established and each case is more or less determined on its own merits. *Raines* v. *Ches. & O. R'y. Co.,* 39 W. Va. 50, 19 S. E. 565. There are, of course, general principles announced in decisions of the courts which tend to throw light upon the subject, but each general principle must be read in connection with the facts of the case wherein it is announced, and as compared to the facts of the case presently under consideration. *Barron* v. *Railroad Co.,* 116 W. Va. 21, 23, 178 S. E. 277. Hereinafter we shall endeavor to set forth such of those general principles as are deemed applicable to the case at bar, and therefrom determine the degree of care to which plaintiff's decedent was entitled from defendants under the facts disclosed by the record herein.

Of primary importance, as in all cases wherein an injury occurs to a plaintiff while on defendant's premises, is the relationship between the parties. That is to say, was plaintiff's decedent an invitee, licensee, or tresspasser on the property of the railroad company?

Neither by his pleadings, nor by evidence adduced in his behalf, does plaintiff contend that J. H. Foster was a business invitee of defendants in the common and accepted sense of the term. It is true that plaintiff's declaration alleges that defendants had "knowingly * * * invited" decedent to use the premises. Furthermore, there is some evidence that in the near vicinity of this fatal accident, there is a footbridge leading from the paved highway, across the creek at a point beneath the railway company's bridge for its siding, which extends from the yards to the north. However, this evidence is adduced only by the introduction of a photograph of the footbridge as an exhibit. Therefrom it is seen that on the southern end of the footbridge is a stairway leading up an embankment to what appears to be a small platform which seems to abut on the main line tracks. At first blush, it might appear that said footbridge constituted, in effect, an invitation to the general public to walk upon

the railroad yards at or near the same. However, no further evidence was offered respecting the footbridge. It is not shown who constructed and maintained the same, nor is it shown, with any degree of clarity, the distance therefrom to the scene of the accident. Accordingly, in the present state of the record we cannot consider plaintiff's decedent an invitee, on the premises of the defendant railway company, by reason of such bridge.

Defendants contend that whether J. H. Foster was a licensee or a trespasser is immaterial in this case for the reason that in either event the duty of care to which he was entitled from defendants at the time of the accident was no higher than not wantonly or wilfully to injure him. In support of this contention, defendants cite, among others, the recent case of *Hall* v. *Pub. Serv. Co.*, 128 W. Va. 547, 37 S. E. 2d 471, which holds: "One not in the employ of a railway company, using its tracks as a walkway over a portion thereof which pedestrians are accustomed to use for such purpose, but not a public crossing, is at most a mere licensee, and such railway company owes to him no higher or other duty than it owes to a trespasser." This principle appears to represent the weight of authority elsewhere. 44 Am. Jur., Railroads, Section 425. Certainly, it is one of general application in this jurisdiction. See *Ballard* v. *Railroad Co.*, 113 W. Va. 660, 169 S. E. 524; *Cheek* v. *Director General*, 87 W. Va. 321, 104 S. E. 618; *Robertson* v. *Railway Co.*, 87 W. Va. 106, 104 S. E. 615; *Blagg* v. *Railroad Co.*, 83 W. Va. 449, 98 S. E. 526; *Tompkins* v. *Sunday Creek Co.*, 68 W. Va. 483, 69 S. E. 980; *Bralley* v. *Railway Co.*, 66 W. Va. 462, 66 S. E. 653; *Melton* v. *Railroad*, 64 W. Va. 168, 61 S. E. 39; *Huff* v. *Chesapeake & Ohio R'y.*, 48 W. Va. 45, 35 S. E. 866; *Spicer* v. *Ches. & O. R'y. Co.*, 34 W. Va. 514, 12 S. E. 553.

Although the foregoing represents the general rule in this and other jurisdictions, there is a modification or exception thereto which is of widespread application. Such modification or exception to the general rule is applicable where plaintiff's presence is to be anticipated by the railroad company at the place where the injury occurs. 44 Am. Jur., Railroads, Section 425. Many courts apply the

modification or exception on the theory that plaintiff, in such instances, is an "implied invitee," entitled to a duty of care commensurate with the risk of injury. 44 Am. Jur., Railroads, Sections 427, 437.

In such respect this Court has never adopted the "implied invitee" doctrine. But we have heretofore reached the same result, although treating plaintiff as a licensee or trespasser. Such was the case in *Barron* v. *Railroad Co., supra,* wherein it was stated: "A railroad must exercise ordinary care, commensurate with the risk of injury, in operating its train at a place where persons may be expected to be on the track." To the same effect see *Vest* v. *Railway Co.,* 117 W. Va. 457, 187 S. E. 358; *Stuck* v. *Railway Company,* 76 W. Va. 453, 86 S. E. 13; *Ray* v. *Ches. & Ohio Railway Co.,* 57 W. Va. 333, 50 S. E. 413; *McVey* v. *Railway Co.,* 46 W. Va. 111, 32 S. E. 1012; *Nuzum* v. *Railway Co.,* 30 W. Va. 228, 4 S. E. 242. It is, of course, the doctrine as stated in *Barron* v. *Railroad Co., supra,* on which plaintiff has based this action, which doctrine was adopted by the trial court in its rulings on the admission of evidence and on the giving of instructions.

Although the doctrine stated in *Barron* v. *Railroad Co., supra,* has since been approved, the application thereof has been restricted to cases wherein the injured person is a licensee, express or implied, upon the tracks of a railroad company. And if the licensee exceeds the purpose for which the license has been allowed, he thereupon becomes a trespasser, for the death or injury of whom the railroad company is not responsible unless caused by its wanton and wilful act. *Connelly* v. *Railway Co.,* 124 W. Va. 254, 20 S. E. 2d 885.

Another restriction to the application of the modification or exception to the general rule heretofore stated and discussed in *Hall* v. *Pub. Serv. Co., supra,* and kindred cases, is where the accident occurs in the railroad yards of the defendant railway company, which are posted with signs warning the public of dangers incident therein. The law respecting the effect of posting such warning signs is, as a whole, confusing. See 47 L. R. A. (N. S.) 506. But,

as was stated in *Huff* v. *Chesapeake & Ohio R'y.*, *supra*: "A railroad track anywhere is alone a warning of great danger; but how much more dangerous is * * * [a railroad] yard * * *, full of tracks, trains, and engines at all times or at any time." Because of the very nature of the yards of a railroad company, and the use to which it is constantly put by operations thereon, we deem the decision reached in the *Huff* case sound. The exception and modification to the general rule, as expressed in the *Barron* and kindred cases is not applicable to cases wherein the accident occurred in defendant railroad company's yards, as was the case here. In the present state of the record in this case, defendants owed plaintiff's decedent a duty of care no higher than not wantonly or wilfully to injure him.

For reasons stated herein, the judgment of the Circuit Court of Fayette County is reversed, the verdict set aside, and defendants are awarded a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*

KENNA, JUDGE, concurring:

I agree that in a personal injury case when the defense of contributory negligence is recognized in submission to a jury a binding instruction on behalf of the plaintiff which fails to plainly and expressly negative that defense it is reversible error. Consequently, I do not dissent from the first point in this case.

However, I do not otherwise agree with the conclusions of the majority nor with its discussion of the status of an outsider who habitually uses, along with others, the tracks of a railroad at a given point as a walkway. Under our West Virginia cases, although he is usually termed a trespasser, the principles applicable to ordinary trespass are certainly not applied consistently. To my mind our cases are in well nigh hopeless conflict and concern a more or less involved history which is not always directly relevant.

The Court, in *Dickinson* v. *New River & Pocahontas Consol. Coal Company*, 76 W. Va. 148, 85 S. E. 71, after declaring that infants stand upon the same footing as adults as trespassers, had this to say:

"From the operation of this general rule, no class of property owners other than railroad companies has been excepted, and it was extremely difficult to find any principle upon which they could be taken out of it, to the extent of requiring them to keep a reasonable lookout for trespassers and licensees on their tracks at places other than public crossings. This has been done, however, and, in justification of the court's action in doing so, Judge BRANNON said in *Gunn* v. *Railroad Co.,* 42 W. Va. 676, 680: 'The public interest and necessity, not merely the company's, demand that the company have sole possession of its track; but, as people live and move along the route, they do go upon the track; children in their thoughtlessness often wander upon it; and sheer necessity calls for such care as is exacted by the rule.' Judge HOLT'S observation upon the same subject, in *Gunn* v. *Railroad Co.,* 36 W. Va. 165, 175, is in part as follows: 'Again, that some one shall always be on the lookout on a running train is, from its nature and as shown by experience, one of the most important safeguards; indispensable, in fact, for the passenger on the going train as well as the passenger on the coming train— for those off, as well as those on the train. The enforcement of such lookout is so imperative, on the ground of public policy, that the law may impose it as a duty, due to one who may himself be in the wrong.' This denial to railroad companies of the immunity accorded by law to other property owners and imposition upon them of duties toward trespassers and bare licensees, to which other property owners are not subjected, are clearly based upon the peculiarities of their property, their methods of business and their relation to the public. Whether these facts, circumstances and considerations justify the discrimination, we need not inquire. it suffices to show that railroad companies, as property owners, have been put· in a class distinctively their own."

The case of *Gunn* v. *Ohio River Railroad Company*, 42 W. Va. 676, 26 S. E. 546, laid down this rule in the third syllabus:

"The engineer and fireman of a railroad train must keep a careful lookout on the track ahead to discover persons and animals upon it, and use ordinary care to avoid injury to them."

The reason that persons and animals were placed in the same category in the *Gunn* syllabus was because in *Blaine* v. *C. & O. Railroad Company*, 9 W. Va. 252, recovery of the value of a horse killed by a train on the railroad track was approved. In the *Blaine* opinion will be found a discussion of the common law rule requiring that horses and stock be restrained by their owner and of the fact that before the creation of West Virginia the Commonwealth of Virginia had by statute abolished that rule and had provided in effect that the owners of land desiring to protect it should fence and that otherwise animals upon it would not be regarded as trespassing but as being upon common property, which they had a right to be. The open range upon unfenced property became the law in West Virginia, later made subject to local option in magisterial districts and now abolished by statute.

It will be noted that the *Blaine* case conferred upon animals a higher right to the use of the property of another than that of ordinary trespassers.

To the same effect as the *Gunn* case are the following cases: *McGuire* v. *Norfolk & W. Railroad Company*, 70 W. Va. 538, 74 S. E. 859; *Stuck* v. *Kanawha & M. Railroad Company*, 78 W. Va. 490, 89 S. E. 280; *Stuck* v. *Kanawha & M. Railroad Company*, 76 W. Va. 453, 86 S. E. 13; *Nuzum* v. *Pittsburgh, C. & St. L. Railroad Company*, 30 W. Va. 228, 4 S. E. 242, and other cases recognizing the same principle though not directly in point.

It is true that the case of *Huff* v. *Chesapeake & Ohio Railway*, 48 W. Va. 45, 35 S. E. 866, discusses a railroad track as being a warning of great danger and a railroad yard as involving a greater hazard. However, the same

judge who wrote the opinion in the *Huff* case had this to say in the *Gunn* case at page 680:

"* * * The law is clear that those in charge of a train must, by keeping up a reasonable lookout, use fairly ordinary care to discover animals and persons on the track, both to save them and passengers from injury. The public interest and necessity, not merely the company's, demand that the ·company have sole possession of its track; but, as people live and move along the route, they do go upon the tracks; children, in their thoughtlessness and indiscretion, will go upon it; stock will wander upon it; and sheer necessity calls for such care as is exacted by this rule. *Gunn* v. *Railroad Co.*, 36 W. Va. 165 (14 S. E. 465) ; 2 Wood, Ry. Law, §320; opinions in *Raines* v. *Railroad Co.*, 39 W. Va. 50 (19 S. E. 565). Some courts hold that no duty lies on the company to look ahead for persons on the track, as it has exclusive right to its track except at crossings, and they are trespassers; but we have held that there must be a lookout even for live stock and ordinary care to prevent injury to it. *Layne* v. *Railroad Co.*, 35 W. Va. 438 (14 S. E. 123) and cases. And, certainly, the same care would be required so far as infants, deaf and other disabled persons are concerned, if not as to others. * * *."

In this jurisdiction railroads are undoubtedy charged with the duty of maintaining a reasonable lookout for trespassers upon their tracks. Cases so holding can be easily located by turning to Michie's Digest "Railroads" §62. See also §§71 & 74. Certainly that is a much higher duty than that stated in the majority opinion to merely abstain from wanton or willful injury.

It may, therefore, be conceded that the defendant owed the plaintiff no higher duty than that it owed a trespasser, as is stated in the majority opinion. But that does not resolve the question presented by this record. That question is: did the defendant maintain a reasonable lookout, consistent with the other duties of its train crew, upon the train the operation of which caused the death of plaintiff's decedent? That, in my opinion, was a question for the jury and on it its verdict should not be disturbed.

The first syllabus in *Prok, Adm'r.* v. *N. & W. Railway Company,* 75 W. Va. 697, 84 S. E. 568, reads as follows:

"Whether it is negligence on the part of a railroad company, to run an engine or train of cars backwards, through a village, without some person on the tender or foremost car, to keep a lookout for persons who may happen to be on the track and take precautions against injury to them, generally depends upon the circumstances of the particular case, and *is a question for jury determination."* (Italics supplied.)

True, in the *Prok* case, the plaintiff's decedent was an infant, but since infants and adults have the same status in so far as being trespassers is concerned, and the law requiring a reasonable lookout consistent with other duties applies to both, in principle if not in sentiment, infancy does not alter the rule.

The testimony conflicts concerning the ringing of the bell and the sounding of the whistle of the locomotive and also as to lights on the exposed end of the caboose, the witnesses for the defendant stating its two "marker lights" which shone red in the direction in which it was moving and an ordinary oil lantern on its platform were lighted. No witness for the defendant states that the track was illuminated in any manner. To the contrary, H. E. Williams says that he was on the platform of the caboose with an ordinary electric hand light, saw the Fosters and Coleman, shouted at them, and undertook to signal the engineer with his flashlight. He says that this occurred "too late". The defendants' witnesses agree that although the engine's rear headlight was burning, it threw no light on the track ahead on account of the blocking caboose. The equipment on the platform of the caboose intended for use in applying the brakes when backing and as a means of a danger warning to persons on the track and to the engineer was out of order. I cannot understand how a reasonable *lookout* consistent with their other duties could be maintained by the defendant's employees when on an unlighted track, nor how the railroad can contend that it exercised proper care for the safety of trespassers when

discovered, if its equipment intended to insure their safety had been permitted to become unworkable. Furthermore, there is evidence, including that of a wooden footbridge from about the middle of the yard across the creek to the main highway, from which a jury might conclude that decedent was an "implied invitee". See *Barron* v. *Baltimore & O. R. Co.*, 116 W. Va. 21, 178 S. E. 277. What I have stated as to the proof is taken from the majority opinion and I believe clearly shows that, coupling the admitted facts with the conflicting testimony, the issue was properly submitted to the jury and that its finding should not be disturbed on the ground that the plaintiff has failed to make a case.

I am authorized to state that Judge Riley joins in this concurrence.